Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WEIR, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANZ SE, and OLIVER BÄTE,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Weir ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, announcements, wire and press releases published by and regarding Allianz SE ("Allianz" or the "Company"), and information readily

obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Allianz securities between March 9, 2018 and May 17, 2022, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

– 2 –

7. Defendant Allianz together with its subsidiaries, provides property-casualty insurance, life/health insurance, and asset management products and services worldwide. Allianz Global Investors U.S. LLC ("AGI US") is a subsidiary of Allianz.

8. Defendant Allianz is incorporated in Germany with its principal executive offices at Koeniginstrasse 28, Munich 80802, Germany. The Company's American depositary receipts ("ADRs") trade on the OTC Pink market under the ticker symbol "ALIZY."

9. Defendant Oliver Bäte ("Bäte") has served as the Chief Executive Officer ("CEO"), also called the Chairman of the Board of Management, since 2015.

10. Defendants Bäte is sometimes referred to herein as the "Individual Defendant."

11. The Individual Defendant:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

— 3 —

(g)     approved or ratified these statements in violation of the federal securities laws.

12.    The Company is liable for the acts of the Individual Defendant and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.    The scienter of the Individual Defendant and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14.    The Company and the Individual Defendant are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

## Materially False and Misleading Statements

15.    On March 9, 2018, the Company published its annual report for 2017 (the "2017 Annual Report"). The 2017 Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

**OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT**

A comprehensive system of risk governance is achieved by setting standards related to the organizational structure, the risk strategy and appetite, limit systems, documentation, and reporting. These standards ensure the accurate and timely flow of information and a disciplined approach towards decision-making and execution.

As a general principle, the "first line of defense" rests with business managers in the business units of Allianz SE. They are responsible for both the risks and returns from their decisions. Our "second line of defense" is made up of independent oversight functions including risk, actuarial, compliance, and legal, which support the Board in defining the risk framework within which the business can operate.

– 4 –

Audit forms the "third line of defense", independently reviewing Allianz SE's risk governance implementation and compliance with risk principles. It performs quality reviews of risk processes, and tests adherence to business standards, including the internal control framework .For [sic] the first and the second line of defense, Allianz SE has established dedicated responsibilities at its departments (including reinsurance).

*       *       *

**Corporate governance practices**

**INTERNAL CONTROL SYSTEMS**

***Allianz SE, as a member of the Allianz Group, has an effective internal risk and control system for verifying and monitoring its operating activities and business processes, in particular financial reporting, as well as compliance with regulatory requirements.*** The requirements placed on the internal control systems are essential not only for the resilience and franchise value of the company, but also to maintain the confidence of the capital market, our customers, and the public. comprehensive risk and control management system regularly also assesses the effectiveness and the appropriateness of the internal control system as part of the System of Governance. For further information on the risk organization and risk principles, please refer to page 19. Information on the internal Controls over Financial Reporting you will find on page 51.

***In addition, the quality of the internal control system is assessed by the Internal Audit Function. It conducts independent, objective assurance and consulting activities, analyzing the structure and efficiency of the internal control systems as a whole.*** In addition, it also examines the potential for additional value and improvement of our organization's operations. Fully compliant with all international auditing principles and standards, Internal Audit contributes to the evaluation and improvement of the effectiveness of the risk management, control and governance processes. Therefore, internal audit activities are geared towards helping the company to mitigate

– 5 –

risks and further assist in strengthening its governance processes and structures.

… The central compliance function of Allianz SE is responsible for ensuring – in close cooperation with regional, divisional and local compliance functions – the effective implementation and monitoring of the compliance program as well as for investigating potential compliance infringements.

\*      \*      \*

**Controls over Financial Reporting**

The following information is given pursuant to § 289 (4) of the HGB.

In line with both our prudent approach to risk governance and compliance with regulatory requirements, we have created a structure to identify and mitigate the risk of material errors in our financial statements (this also includes market value balance sheet and risk capital controls). ***Our internal control system over financial reporting (ICOFR) is regularly reviewed and updated.*** …

**INTERNAL CONTROL SYSTEM APPROACH**

Our approach can be summarized as follows:

− We use a top-down, risk-based approach to determine the accounts that have to be in the **scope of our internal control system over financial reporting**. The methodology is described in the ICOFR manual which is applicable group-wide and the IRCS Guideline. During the scoping process, both materiality and susceptibility to a misstatement are considered simultaneously. In addition to the quantitative calculation, we also consider qualitative criteria.
− Next, we **identify risks** that could lead to material financial misstatements including all relevant root causes (i.e. human processing errors, fraud, system shortcomings, external factors, etc.).
− **Preventive and detective key controls** to address financial reporting risks have been put in place to reduce the likelihood and impact of financial misstatements. If a potential risk materializes, actions are

taken to reduce the impact of the financial misstatement. Given the strong dependence of financial reporting processes on information technology systems, we also implement IT controls.

− ***Finally, we ensure that controls are appropriately designed and effectively executed to mitigate risk.*** We have set consistent documentation requirements across the Allianz Group for elements such as processes, related key controls, and execution. ***We conduct an annual assessment of our control system to maintain and continuously enhance its effectiveness. Audit ensures that the overall quality of our control system is subjected to regular control-testing, to assure reasonable design and operating effectiveness.***

(Emphasis added.)

16.    The 2017 Annual Report included a "Responsibility Statement" signed by Defendant Bäte, which stated the following:

To the best of our knowledge, and in accordance with the applicable reporting principles, the financial statements of Allianz SE give a true and fair view of the assets, liabilities, financial position, and profit or loss of the company, and the management report includes a fair review of the development and performance of the business and the position of the company, together with a description of the principal opportunities and risks associated with the expected development of the company.

17.    On March 7, 2019, the Company published its annual report for 2018 (the "2018 Annual Report"). The 2018 Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

**OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT**

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. These standards ensure the accurate and timely flow of risk related information and a disciplined approach towards decision making and execution.

– 7 –

As a general principle, the "first line of defense" rests with business managers in the business units of Allianz SE (solo). They are responsible for both the risks and returns from their decisions. Our "second line of defense" is made up of independent oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board in defining the risk framework within which the business can operate. Audit forms the "third line of defense", independently and regularly reviewing Allianz SE's risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework. For the first and the second line of defense, Allianz SE has established dedicated responsibilities at its departments (including reinsurance).

\*     \*     \*

**Corporate governance practices**

**INTERNAL CONTROL SYSTEMS**

***Allianz SE, as a member of the Allianz Group, has an effective internal risk and control system for verifying and monitoring its operating activities and business processes, in particular financial reporting, as well as compliance with regulatory requirements.*** The requirements placed on the internal control systems are essential not only for the resilience and franchise value of the company, but also to maintain the confidence of the capital market, our customers, and the public. ***A comprehensive risk and control management system regularly also assesses the effectiveness and appropriateness of the internal control system as part of the System of Governance.*** For further information on our risk organization and risk principles, please refer to page 19. Information on the internal "Controls over Financial Reporting" you will find on page 57.

***In addition, the quality of our internal control system is assessed by the Internal Audit Function.*** This function conducts independent, objective assurance and consulting activities, analyzing the structure and efficiency of the internal control systems as a whole. In addition, it also examines the potential for additional value and improvement of

– 8 –

our organization's operations. Fully compliant with all international auditing principles and standards, Internal Audit contributes to the evaluation and improvement of the effectiveness of the risk management, control, and governance processes. Therefore, internal audit activities are geared towards helping the company to mitigate risks, and further assist in strengthening its governance processes and structures.

## COMPLIANCE MANAGEMENT SYSTEM

Integrity is at the core of our compliance program and the basis to safeguard Allianz' reputation as a trusted financial services provider.

The compliance function promotes, in partnership with management and business, a culture of integrity and compliance by:

− ***Advising on business conduct that is lawful, ethical, and in the interest of our customers, shareholders***, business partners an colleagues;
− ***Preventing and detecting violations of laws and regulations through identifying and managing compliance risks***;
− Advocating Allianz' compliance positions with regulators.

Compliance with all applicable laws, rules, and regulations in all countries in which Allianz SE and Allianz Group operate, as well as with internal policies and guidelines, is key. The global compliance program coordinated by Allianz SE's central Group Compliance function supports our employees, managers and executive board members to act responsibly and with integrity in all situations. We participate in the United Nations Global Compact, the world's largest and most important initiative for responsible corporate leadership, and respect the Guidelines of the Organization for Economic Cooperation and Development (OECD Guidelines) for Multinational Enterprises in that we integrate sustainability and corporate responsibility into our business. By accepting and complying with European and international standards and applicable laws related to relevant compliance risk areas, Allianz aims to avoid the risks that arise from noncompliance. To enhance our understanding of compliance issues and share best practices, we work with organizations such as the German Institute for

– 9 –

Compliance (DICO), the Global Insurance Chief Compliance Officers Forum (CCO Forum) and the S20 – The Sponsors' Voice.

Moreover, *Allianz SE's central Group Compliance function is responsible – in close cooperation with local compliance functions – for ensuring the effective implementation and monitoring of the compliance program within the Allianz Group, as well as for investigating potential compliance infringements*. As a key governance function, the compliance function further conducts the advisory, risk identification and assessment, monitoring and early warning tasks required under the Solvency II regime.

**CODE OF CONDUCT**

Our Code of Conduct for Business Ethics and Compliance and the internal Compliance policies and guidelines derived from it provide all employees, managers and executive board members with clear and practical guidance, enabling them to act in line with the values of the Allianz Group. The standards of conduct established by the Code of Conduct are binding for all employees worldwide and build the basis for our compliance programs. The Code of Conduct is available on our website at www.allianz.com/corporate governance.

**COMPLIANCE PROGRAMS**

Allianz SE's central Group Compliance function has set up internal guidelines for the following identified compliance risk areas: anti-bribery and anti-corruption, anti-money laundering and anti-terrorism financing, economic sanctions compliance, capital markets compliance, sales compliance/customer protection, antitrust compliance, internal fraud, data privacy, and US Foreign Account Tax Compliance Act (FATCA). For further information on these compliance risk areas, please refer to the Combined Separate Non Financial Report for Allianz Group and Allianz SE on page 48 of the Allianz Group's Annual Report 2018 and the Sustainability Report on our website at www.allianz.com/sustainability.

\*      \*      \*

– 10 –

**INTERNAL CONTROL SYSTEM APPROACH**

Our approach can be summarized as follows:

− We use a top down, risk based approach to determine the accounts that have to be in the **scope of our internal control system over financial reporting**. The methodology is described in the IRCS Guideline. During the scoping process, both materiality and susceptibility to a misstatement are considered simultaneously. In addition to the quantitative calculation, we also consider qualitative criteria.

− Next, we **identify risks** that could lead to material financial misstatements including all relevant root causes (i.e. human processing errors, fraud, system shortcomings, external factors, etc.).

− **Preventive and detective key controls** to address financial reporting risks have been put in place to reduce the likelihood and impact of financial misstatements. If a potential risk materializes, actions are taken to reduce the impact of the financial misstatement. Given the strong dependence of financial reporting processes on information technology systems, we also implement IT controls.

− Finally, *we ensure that controls are appropriately designed and effectively executed to mitigate risk. We conduct an annual assessment of our control system to maintain and continuously enhance its effectiveness. Internal audit ensures that the overall quality of our control system is subjected to regular control testing, to assure reasonable design and operating effectiveness.*

\*      \*      \*

The **Audit Committee** held five regular meetings in 2018 and adopted one written resolution. In the presence of the auditors, the committee discussed both Allianz SE's annual financial statements and the Allianz Group's consolidated financial statements, as well as the management and auditor's reports and the half yearly financial report. These reviews revealed no reasons for objection. The Audit Committee further received the Board of Management's reports on quarterly results. It prepared the engagement of the external advisor and defined key audit areas for the 2018 financial year. The committee also discussed the assignments of non-audit services to the auditors and approved an updated appropriate positive list of pre-authorized audit and non-audit

– 11 –

services. ***In addition, it dealt extensively with the compliance system, the internal audit system, and the financial reporting process as well as the respective internal controls.*** The committee received regular reports on legal and compliance issues and on the work of the Internal Audit department, as well as the annual report of the head of the actuarial department (Group Actuarial, Planning & Controlling). Furthermore, the committee dealt with the Internal Audit function's audit plan for 2019. Last but not least, it thoroughly addressed the findings of a BaFin review and the review of the implementation of Solvency II governance requirements in the Allianz Group. The written resolution mentioned above approved the auditor's engagement to perform non-audit services at Group companies abroad.

(Emphasis added.)

18.     The 2018 Annual Report included a "Responsibility Statement" signed by Defendant Bäte, which was substantially the same as the 2017 Annual Report's Responsibility Statement.

19.     On March 5, 2020, the Company published its annual report for 2019 (the "2019 Annual Report"). The 2019 Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

The Audit Committee held five regular meetings in 2019. In the presence of the auditors, the committee discussed both Allianz SE's annual financial statements and the Allianz Group's consolidated financial statements, as well as the management and auditor's reports and the half-yearly financial report. These reviews revealed no reasons for objection. The Audit Committee further received the Board of Management's reports on quarterly results. It prepared the engagement of the external advisor and defined key audit areas for the 2019 financial year. The committee also discussed the assignments of non-audit services to the auditors and approved an updated appropriate positive list of pre-authorized audit and non-audit services. ***In addition, it dealt extensively with the compliance system, the internal audit system, and the financial reporting process as well as the respective internal controls. Regular reports on legal and compliance issues in the Group and individual subsidiaries as well as on the work of the***

– 12 –

***Internal Audit department were presented and discussed in detail.*** Furthermore the head of the actuarial department (Group Actuarial, Planning & Controlling) presented his annual report. In addition, the Audit Committee discussed the internal audit plan for 2020, current developments in data protection, and the forthcoming amendments to the IFRS 9 and 17 accounting standards.

\* \* \*

## OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. These standards ensure the accurate and timely flow of risk-related information and a disciplined approach towards decision-making and execution.

As a general principle, the "first line of defense" rests with business managers in the business units of Allianz SE (solo). They are responsible for both the risks taken and the returns from their decisions. Our "second line of defense" is made up of independent oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board of Management in defining the risk framework within which the business can operate. Audit forms the "third line of defense", independently and regularly reviewing Allianz SE's risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework. For the first and the second line of defense, Allianz SE has established dedicated responsibilities at its departments (including reinsurance).

\* \* \*

**Corporate governance practices**

## INTERNAL CONTROL SYSTEMS

Allianz SE, as a member of the Allianz Group, has an effective internal

– 13 –

risk and control system for verifying and monitoring its operating activities and business processes, in particular financial reporting, as well as compliance with regulatory requirements. The requirements placed on the internal control systems are essential not only for the resilience and franchise value of the company, but also to maintain the confidence of the capital market, our customers, and the public. A comprehensive risk and control management system regularly also assesses the effectiveness and appropriateness of the internal control system as part of the System of Governance. For further information on our risk organization and risk principles, please refer to page 19. Information on the "Integrated Risk and Control System for Financial Reporting" can be found on page 58.

In addition, the quality of our internal control system is assessed by the Internal Audit Function. This function conducts independent, objective assurance and consulting activities, analyzing the structure and efficiency of the internal control systems as a whole. In addition, it also examines the potential for additional value and improvement of our organization's operations. Fully compliant with all international auditing principles and standards, Internal Audit contributes to evaluating and improving of the effectiveness of the risk management, control, and governance processes. Therefore, internal audit activities are geared towards helping the company to mitigate risks, and further assist in strengthening its governance processes and structures.

**COMPLIANCE MANAGEMENT SYSTEM**

***Integrity is at the core of our compliance programs and the basis for the trust of our customers, shareholders, business partners and employees.***

The compliance function fosters a corporate culture of individual and collective responsibility for ethical conduct and adherence to the rules by:

-Advising the board of management, managers and employees on business conduct that is lawful and ethical;

– 14 –

-Identifying and assessing material compliance risks and overseeing the implementation of adequate and effective internal controls to mitigate them;
-Providing a speak-up facility that employees and third parties can use to confidentially address irregularities;
-Interacting transparently and trustfully with regulators.

***Compliance with applicable laws, rules, and regulations in all countries in which Allianz SE and Allianz Group operate, as well as with internal policies and guidelines, is key.*** The global compliance programs coordinated by Allianz SE's central Group Compliance function support our employees, managers and executive board members to act responsibly and with integrity in all situations. By participating in the United Nations Global Compact, the world's largest and most important initiative for responsible corporate leadership, and respecting the Guidelines of the Organization for Economic Cooperation and Development (OECD Guidelines) for Multinational Enterprises, we integrate sustainability and corporate responsibility into our business. By accepting and complying with European and international standards and applicable laws, Allianz aims to avoid the risks that arise from noncompliance. To enhance our understanding of compliance issues and share best practices, we work with organizations such as the German Institute for Compliance (DICO) and the Global Insurance Chief Compliance Officers' Forum (CCO Forum).

***Moreover, Allianz SE's central Group Compliance function is responsible – in close cooperation with local compliance functions – for ensuring the effective implementation and monitoring of the compliance programs within the Allianz Group, as well as for investigating potential compliance infringements.*** Furthermore, as a key function, the compliance function carries out the advisory, risk identification and assessment, monitoring and early warning tasks required under the Solvency II regime.

(Emphasis added.)

– 15 –

20.     The 2019 Annual Report included a "Responsibility Statement" signed by Defendant Bäte, which was substantially the same as the 2017 Annual Report's Responsibility Statement.

21.     On March 5, 2021, the Company published its annual report for 2020 (the "2020 Annual Report"). The 2020 Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

> The Audit Committee held six regular meetings in 2020. In the presence of the auditors, the committee discussed both Allianz SE's annual financial statements and the Allianz Group's consolidated financial statements as well as the management and auditor's reports and the half-yearly financial report. ***These reviews revealed no reasons for objection.*** The Board of Management reported on the quarterly results and discussed them in detail with the Audit Committee together with the results of the auditor's review. One focus of the Audit Committee's activities was the regular review of the impact of the COVID-19 pandemic on all areas of the Allianz Group. ***In this context, the Audit Committee held an additional extraordinary meeting in May and dealt with the withdrawal of the profit target for 2020 by the Board of Management and the proposal for the appropriation of net earnings submitted to the AGM.*** Furthermore, it prepared the engagement of the external auditor and defined key audit areas for the 2020 financial year and assessed the quality of the audit. The committee also discussed the awarding of non-audit services to the auditor and approved an updated positive list of pre-approved audit and non-audit services. In addition, it discussed in depth the compliance system, the internal audit system, and the financial reporting processes as well as the respective internal controls and held intensive discussions with the Board of Management on short and midterm measures to improve and further develop systems and processes. ***At all regular meetings reports on legal and compliance issues in the Group, including lawsuits filed against Allianz Global Investors in a court in New York, as well as on the work of the Internal Audit department were discussed in detail.*** Furthermore, the head of the actuarial function (Group Actuarial, Planning & Controlling) presented his annual report. In addition, the Audit Committee discussed the internal audit plan for 2021 and had the

– 16 –

head of the Group Taxation Department explain the processes and procedures for tax compliance.

\*     \*     \*

## OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. These standards ensure the accurate and timely flow of risk-related information and a disciplined approach towards decision-making and execution.

As a general principle, the responsibility for the "First Line of Defense" rests with business managers in the business units of Allianz SE. They are responsible for both the risks taken and the returns from their decisions. Our "Second Line of Defense" is made up of independent oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board of Management in defining the risk framework within which the business can operate. Audit forms the "Third Line of Defense", independently and regularly reviewing Allianz SE's risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework. Allianz SE has established dedicated responsibilities for the three lines of defense at its departments (including reinsurance).

\*     \*     \*

***Internal controls are embedded in the accounting processes to safeguard the accuracy, completeness, and consistency of the information provided in our financial statements.***

\*     \*     \*

## Corporate governance practices

## INTERNAL CONTROL SYSTEM

– 17 –

*The Allianz Group has an effective internal risk and control system for verifying and monitoring its operating activities and business processes, in particular financial reporting, as well as compliance with regulatory requirements.* The requirements placed on the internal control system are essential not only for the resilience and franchise value of the company, but also to maintain the confidence of the capital market, our customers, and the public. *An assessment of the adequacy and effectiveness of the internal control system as part of the System of Governance is conducted regularly in the course of the review of the business organization.* For further information on our risk organization and risk principles, please refer to the section "Risk governance system" in the Risk and Opportunity Report. For further information on our Integrated Risk and Control System for Financial Reporting, please refer to the respective chapter.

*In addition, the quality of our internal control system is assessed by the Allianz Group's Internal Audit function. This function conducts independent, objective assurance activities, analyzing the structure and efficiency of the internal control system as a whole.* In addition, it also examines the potential for additional value and improvement of our organization's operations. *Fully compliant with all international auditing principles and standards, Internal Audit contributes to the evaluation and improvement of the effectiveness of the risk management, control, and governance processes.* Therefore, internal audit activities are geared towards helping the company to mitigate risks, and further assist in strengthening its governance processes and structures.

**COMPLIANCE MANAGEMENT SYSTEM**

*Integrity is at the core of our compliance programs and the basis for the trust of our customers, shareholders, business partners, and employees.* The compliance function fosters a corporate culture of individual and collective responsibility for ethical conduct and adherence to the rules by:

− Advising the Board of Management, managers, and employees on business conduct that is lawful and ethical;

– 18 –

− Identifying and assessing material compliance risks and overseeing the implementation of adequate and effective internal controls to mitigate them;
− Providing a speak-up facility that employees and third parties can use to confidentially report possible illegal or inappropriate behavior;
− Communicating transparently and trustfully with supervisory authorities.

The global compliance programs coordinated by Allianz SE's central Group Compliance function support our employees, managers, and executive board members to act responsibly and with integrity in all situations.

Moreover, *Allianz SE's central Group Compliance function is responsible – in close cooperation with local compliance functions – for ensuring the effective implementation and monitoring of the compliance programs within the Allianz Group as well as for investigating potential compliance infringements.* Furthermore, as a key function, the compliance function carries out the advisory, risk identification and assessment, monitoring, and early warning tasks required under the Solvency II regime.

(Emphasis added.)

22.     The 2020 Annual Report did not reveal the severe underlying issues but instead merely stated the following, in pertinent part, regarding the Company's and its subsidiaries' relevant legal and regulatory issues:

Since July 2020, multiple complaints have been filed in the U.S. Federal Court for the Southern District of New York (the "S.D.N.Y."), and also in certain U.S. State Courts against Allianz Global Investors U.S. LLC ("AllianzGI U.S. LLC") and in certain complaints, against certain of AllianzGI U.S. LLC's affiliates, including Allianz SE and Allianz Asset Management GmbH ("Affiliate Allianz Defendants"), in connection with losses suffered by investors in AllianzGI U.S. LLC's Structured Alpha funds ("Funds") during the COVID-19 related market downturn. The actions brought to date have included institutional investor plaintiffs and individual plaintiffs with certain plaintiffs

– 19 –

asserting claims on behalf of putative classes. An investment consultant has also asserted third-party claims against AllianzGI U.S. LLC. Plaintiffs in the pending actions have alleged losses of several billion dollars. In exchange for a tolling agreement, plaintiffs in the actions filed in the S.D.N.Y. have agreed to voluntarily dismiss claims against the Affiliate Allianz Defendants. In addition to the complaints filed to date, other investors in the Funds, or other third parties, may bring similar actions. ***Allianz intends to defend vigorously against the allegations contained in the complaints. AllianzGI U.S. LLC has also received information requests from the U.S. Securities and Exchange Commission ("SEC") regarding an SEC investigation of the Funds, and is fully cooperating with the SEC's investigation.*** The ultimate outcome of the court proceedings as well as the SEC investigation cannot yet be determined.

(Emphasis added.)

23.     The 2020 Annual Report included a "Responsibility Statement" signed by Defendant Bäte, which was substantially the same as the 2017 Annual Report's Responsibility Statement.

24.     The statements referenced in ¶¶15-23 above, made by or attributed to Defendants, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Allianz did not have effective internal controls; (2) Allianz's subsidiary was involved in substantial fraudulent activity; (3) as a result, Allianz was at an increased risk of regulatory scrutiny; (4) as a result, Allianz was at an increased risk of substantial losses and financial costs; and (5) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## THE TRUTH BEGINS TO EMERGE

25.     On March 4, 2022, the Company published its annual report for 2021 (the "2021 Annual Report"). The 2021 Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

*Internal controls are embedded in the accounting processes to safeguard the accuracy, completeness, and consistency of the information provided in our financial statements.*

\*          \*          \*

**Corporate governance practices**

**Internal control system**

*The Allianz Group has an effective internal risk and control system for verifying and monitoring its operating activities and business processes, in particular financial reporting, as well as compliance with regulatory requirements.* The requirements placed on the internal control system are essential, not only for the resilience and franchise value of the company, but also to maintain the confidence of the capital market, our customers, and the public. An assessment of the adequacy and effectiveness of the internal control system as part of the System of Governance is conducted regularly in the course of the review of the business organization. For further information on our risk organization and risk principles, please refer to the section "Risk governance system" in the Risk and Opportunity Report. For further information on our Integrated Risk and Control System for Financial Reporting, please refer to the respective chapter.

In addition, *the quality of our internal control system is assessed by the Allianz Group's Internal Audit function. This function conducts independent, objective assurance activities, analyzing the structure and efficiency of the internal control system as a whole.* In addition, it also examines the potential for additional value and improvement of our organization's operations. *Fully compliant with all international auditing principles and standards, Internal Audit contributes to the evaluation and improvement of the effectiveness of the risk*

– 21 –

***management, control, and governance processes.*** Therefore, internal audit activities are geared towards helping the company to mitigate risks, and further assist in strengthening its governance processes and structures.

**Compliance management system**

***Integrity is at the core of our compliance programs and the basis for the trust of our customers, shareholders, business partners, and employees.*** The Compliance function fosters a corporate culture of individual and collective responsibility for ethical conduct and adherence to the rules by:

− advising the Board of Management, managers, and employees on business conduct that is lawful and ethical;
− identifying and assessing material compliance risks and overseeing the implementation of adequate and effective internal controls to mitigate them;
− providing a speak-up facility that employees and third parties can use to confidentially report possible illegal or inappropriate behavior;
− communicating transparently and trustfully with supervisory authorities.
The global compliance programs coordinated by Allianz SE's central Group Compliance function support our employees, managers, and executive board members to act responsibly and with integrity in all situations.

***Moreover, Allianz SE's central Group Compliance function is responsible – in close cooperation with local compliance functions – for ensuring the effective implementation and monitoring of the compliance programs within the Allianz Group as well as for investigating potential compliance infringements.*** Furthermore, as a key function, the Compliance function carries out the advisory, risk identification and assessment, monitoring, and early warning tasks required under the Solvency II regime.

(Emphasis added.)

26.     The 2021 Annual Report did not reveal the severe underlying issues but instead stated the following, in pertinent part, regarding the Company's and its subsidiaries' relevant legal and regulatory issues:

**Litigation**

***Allianz SE is involved in legal, regulatory, and arbitration proceedings in Germany and foreign jurisdictions, including the United States. Such proceedings arise in the ordinary course of business, including, amongst others, Allianz SE's activities as a reinsurance company, employer, investor and taxpayer.*** While it is not feasible to predict or determine the ultimate outcome of such proceedings, they may result in substantial damages or other payments or penalties, or result in adverse publicity and damage to Allianz SE's reputation. As a result, such proceedings could have an adverse effect on Allianz SE's business, financial condition, and results of operations. Apart from the proceedings discussed below, Allianz SE is not aware of any threatened or pending legal, regulatory or arbitration proceedings which may have, or have had in the recent past, significant effects on its financial position or profitability. Material proceedings in which Allianz SE is involved are in particular the following:

Since July 2020, multiple complaints have been filed in U.S. Federal Courts and also in certain U.S. State Courts against Allianz Global Investors U.S. LLC (AllianzGI U.S.) and in certain complaints, against certain of AllianzGI U.S.'s affiliates, including Allianz SE and Allianz Asset Management GmbH ("Affiliate Allianz Defendants"), in connection with losses suffered by investors in AllianzGI U.S.'s Structured Alpha funds (Funds) during the COVID-19 related market downturn. The actions brought to date have included institutional investor plaintiffs and individual plaintiffs, with certain plaintiffs asserting claims on behalf of putative classes. An investment consultant has also asserted third-party claims against AllianzGI U.S.. Plaintiffs in the currently pending 26 actions have alleged losses of approximately USD 6.3 bn. In addition to the complaints filed to date, other investors in the Funds, or other third parties, may bring similar actions. ***Plaintiffs in these actions have dismissed without prejudice all claims against Affiliate Allianz Defendants, including Allianz SE and Allianz Asset***

– 23 –

*Management GmbH, with only one exception where Allianz Global Investors Distributors LLC is kept as a defendant next to AllianzGI U.S. AllianzGI U.S. continues to defend against the allegations contained in the complaints.*

*Upon request from the U.S. Securities and Exchange Commission (SEC), AllianzGI U.S. has provided substantial information to the SEC in connection with an SEC investigation of the Funds, and Allianz is fully cooperating with the SEC's ongoing investigation.*

*In addition, the U.S. Department of Justice (DOJ) is continuing its investigation concerning the Funds, and AllianzGI U.S. is also fully cooperating with the DOJ in the investigation and is continuing its own review of the matter.*

On 1 August 2021, in light of the DOJ investigation and based on information then available to Allianz, the Board of Management of Allianz SE reassessed the Structured Alpha matter and came to the conclusion, as also announced by ad-hoc disclosure, that there is a relevant risk that the matters relating to the Funds could materially impact future financial results of Allianz Group.

*In light of the discussions with plaintiffs and U.S. Governmental Authorities concerning the Structured Alpha matter and in anticipation of settlements with major investors in the Funds, Allianz decided, as announced by ad-hoc disclosure on 17 February 2022, to recognize a provision of € 3.7 bn for the fourth quarter of 2021 within the Asset Management segment of the Allianz Group financial statements.* The provision reflects the elements of the expected obligation in the Structured Alpha matter, for which, as of today, a reliable estimate could be determined. Final settlements with major investors were reached shortly thereafter and Allianz believes that these settlements represent a substantial majority of the Structured Alpha civil litigation exposure.

Discussions with remaining plaintiffs, the DOJ as well as the SEC are ongoing, and the timing and nature of any global or coordinated resolution of these matters is not certain. Therefore, as of today, the total financial impact of the Structured Alpha matter cannot be reliably

– 24 –

estimated and it is expected that additional expenses will be incurred before these matters are finally resolved. Such additional expenses also cannot reliably be estimated and consequently are not included in the provision recognized in the Allianz Group financial statements. For Allianz SE the Structured Alpha matter has not led to any requirement for building a provision.

(Emphasis added.)

27.    The 2021 Annual Report included a "Responsibility Statement" signed by Defendant Bäte, which was substantially the same as the 2017 Annual Report's Responsibility Statement.

28.    On this news, the Company's ADR price fell $0.93 per share, or 4.5%, to close at $19.67 per share on March 7, 2022, the next trading day, damaging investors.

29.    The statements referenced in ¶¶25-27 above, made by or attributed to Defendants, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Allianz did not have effective internal controls; (2) Allianz and its employees did not fully cooperate with government authorities; (3) Allianz's subsidiary was involved in substantial fraudulent activity; (4) as a result was at an increased risk of regulatory scrutiny; (5) as a result, Allianz was at an increased risk of substantial losses and financial costs; and (6) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## **The Truth Emerges**

30.     On February 17, 2022, during market hours, Allianz announced that it had booked a provision with regards to "the pending court and governmental proceedings in the U.S. in relation to the Structured Alpha Funds," and provided the following, in pertinent part:

> **Provision with respect to AllianzGI US Structured Alpha Funds; new share buy-back of up to EUR 1 billion**
>
> *Allianz to book a provision with respect to risks relating to the AllianzGI US Structured Alpha Funds in the financial statements 2021; Allianz resolves on new share buy-back of up to EUR 1 billion*
>
> With respect to the pending court and governmental proceedings in the U.S. in relation to the Structured Alpha Funds, Allianz anticipates settlements with major investors in those Funds shortly. ***In anticipation thereof and in light of current discussions with U.S. governmental authorities, Allianz today decided to book a provision of 3.7 billion euros in the financial statements 2021. This provision reduced the 2021 Group net income by 2.8 billion euros.***

(Emphasis added.)

31.     On this news, the Company's ADR price fell $0.98 per share, or 3.8%, to close at $24.33 per share on May 18, 2022, the next full trading day, damaging investors.

32.     On May 17, 2022, during market hours, the SEC issued a press release entitled "SEC Charges Allianz Global Investors and Three Former Senior Portfolio Managers with Multibillion Dollar Securities Fraud" which further provided the following regarding the fraudulent scheme in pertinent part:

> ***The Securities and Exchange Commission (SEC) today charged Allianz Global Investors U.S. LLC (AGI US) and three former senior portfolio managers with a massive fraudulent scheme that concealed the immense downside risks of a complex options trading strategy***

– 26 –

*they called "Structured Alpha."* AGI US marketed and sold the strategy to approximately 114 institutional investors, including pension funds for teachers, clergy, bus drivers, engineers, and other individuals. After the COVID-19 market crash of March 2020 exposed the fraudulent scheme, the strategy lost billions of dollars as a result of AGI US and the portfolio managers' misconduct. *AGI US has agreed to pay billions of dollars as part of an integrated, global resolution, including more than $1 billion to settle SEC charges and together with its parent, Allianz SE, over $5 billion in restitution to victims.*

"*Allianz Global Investors admitted to defrauding investors over multiple years, concealing losses and downside risks of a complex strategy, and failing to implement key risk controls*," said SEC Chair Gary Gensler. …

The SEC's complaint, filed in the federal district court in Manhattan, alleges that *Structured Alpha's Lead Portfolio Manager, Gregoire P. Tournant, orchestrated the multi-year scheme to mislead investors who invested approximately $11 billion in Structured Alpha, and paid the defendants over $550 million in fees*. It further alleges that, *with assistance from Co-Lead Portfolio Manager, Trevor L. Taylor, and Portfolio Manager, Stephen G. Bond-Nelson, Tournant manipulated numerous financial reports and other information provided to investors to conceal the magnitude of Structured Alpha's true risk and the funds' actual performance.*

*Defendants reduced losses under a market crash scenario in one risk report sent to investors from negative 42.1505489755747% to negative 4.1505489755747% -- by simply dropping the single digit 2. In another example, defendants "smoothed" performance data sent to investors by reducing losses on one day from negative 18.2607085709004% to negative 9.2607085709004% -- this time by cutting the number 18 in half.*

*When the 2020 COVID-related market volatility revealed that AGI US and the defendants had misled investors about the fund's level of risk, the fund suffered catastrophic losses and investors lost billions; the defendants all the while profited from their deception.* The complaint further alleges that *Tournant, Taylor, and Bond-Nelson*

– 27 –

*then made multiple, ultimately unsuccessful, efforts to conceal their misconduct from the SEC*, including false testimony and meetings in vacant construction sites to discuss sending their assets overseas.

"*From at least January 2016 through March 2020, the defendants lied about nearly every aspect of a highly complex investment strategy they marketed* to institutional investors, including pension funds managing the retirement savings of everyday Americans. *While they were able to solicit over $11 billion in investments by the end of 2019 and earn over $550 million in fees as a result of their lies, they lost over $5 billion in investor funds when the market volatility of March 2020 exposed the true risk of their products*," said Gurbir S. Grewal, Director of the SEC's Division of Enforcement. "*Following the crash of the Structured Alpha Funds, the defendants continued their pattern of deceit by lying to SEC staff and their fraud would have gone undetected if it weren't for the persistence of SEC lawyers who pieced together the full scope of the massive fraud*."

*AGI US admitted that its conduct violated the federal securities laws* and agreed to a cease-and-desist order, a censure and payment of $315.2 million in disgorgement, $34 million in prejudgment interest, and a $675 million civil penalty, a portion of which will be distributed to certain investors, with the amount of disgorgement and prejudgment interest deemed satisfied by amounts it paid to the U.S. Department of Justice as part of an integrated, global resolution. In a parallel criminal proceeding, the U.S. Attorney's Office for the Southern District of New York today announced criminal charges for similar conduct against AGI US, Tournant, Taylor, and Bond-Nelson. As part of the parallel criminal proceeding, AGI US, Taylor and Bond-Nelson have agreed to guilty pleas.

(Emphasis added.)

33.    That same day, May 17, 2022, the U.S. Department of Justice ("DOJ") issued a press release entitled "Three Portfolio Managers And Allianz Global Investors U.S. Charged In Connection With Multi-Billion Dollar Fraud Scheme"

– 28 –

which further provided the following regarding the fraudulent scheme, in pertinent part:

> Damian Williams, the United States Attorney for the Southern District of New York, Lisa O. Monaco, the Deputy Attorney General of the United States, and Daniel B. Brubaker, Inspector-in-Charge of the New York Office of the U.S. Postal Inspection Service ("USPIS"), announced today the unsealing of an indictment charging GREGOIRE TOURNANT, the Chief Investment Officer and co-lead Portfolio Manager for a series of private investment funds managed by Allianz Global Investors U.S. LLC ("AGI"), with conspiracy, securities fraud, investment adviser fraud, and obstruction of justice offenses in connection with a scheme to defraud investors. Those funds ultimately collapsed, leading to billions of dollars of investor losses. TOURNANT surrendered to Postal Inspectors in Denver, Colorado this morning and is expected to be presented later today. The case has been assigned to U.S [sic] District Judge Laura Taylor Swain.
>
> Also unsealed today are the guilty pleas of TREVOR TAYLOR and STEPHEN BOND-NELSON in connection with their respective roles in the scheme. TAYLOR pled guilty pursuant to an Information before U.S. District Judge Denise Cote on March 8, 2022. BOND-NELSON pled guilty pursuant to an Information before U.S. District Judge Paul A. Engelmayer on March 3, 2022. Both are cooperating with the Government.
>
> ***U.S. Attorney Williams, Deputy Attorney General Monaco, and Inspector-in-Charge Brubaker also announced today a plea agreement (the "Agreement") pursuant to which AGI will plead guilty to securities fraud in connection with this fraudulent scheme, and pay more than $3 billion in restitution to the innocent victims of this fraud, pay a criminal fine of approximately $2.3 billion, and forfeit approximately $463 million to the Government.*** The case has been assigned to U.S. District Judge Colleen McMahon. A conference has been scheduled for today at 3:00 p.m. before U.S. District Judge Loretta A. Preska, Part I, at which time ***AGI is expected to plead guilty*** to an Information pursuant to the Agreement.

– 29 –

U.S. Attorney Damian Williams said: "***As alleged, Gregoire Tournant and his co-conspirators lied to investors and secretly exposed them to substantial risk in order to line their own pockets and those of their employer, AGI.*** Pension funds for so many retirees, religious organizations, and essential workers – from laborers in Alaska, to teachers in Arkansas, to bus drivers and subway conductors here in New York City – ***invested with AGI because they were promised a relatively safe investment with strict risk controls***. ***But AGI, the "master cop" that Tournant claimed was watching over his shoulder, making sure that he adhered to his promises, was asleep on the beat.*** And when the storm came in March 2020, when the COVID crash hit, these investors got soaked and lost billions. Today's actions are further evidence that this office is not asleep on the beat and that with our law enforcement partners we will act swiftly to protect investors and bring white collar criminals to justice."

Deputy Attorney General Lisa O. Monaco said: "I previously warned that the Department of Justice would crack down on corporate crime, without regard to size, salary, or other privilege. For the second time in under a month, the Department has brought charges in connection with a sophisticated Wall Street scheme that cost victims billions of dollars. Other corporations should take note that ***the results here are driven in part by the fact that this company failed to self-report their crimes***. The Department stands ready to keep bringing these kinds of charges to assure the public that no one is above the law." …

According to the allegations in the Indictment and the Agreement unsealed today in Manhattan federal court: [footnote omitted]

Between 2014 and 2020, GREGOIRE TOURNANT, the defendant, was the Chief Investment Officer of a set of private funds at AGI known as the Structured Alpha Funds. These funds were marketed largely to institutional investors, including pension funds for workers all across America. As alleged, TOURNANT and his co-conspirators misled these investors into believing that the funds were protected from a sudden stock market crash with particular hedges. ***But in late 2015, as the cost of those promised hedges increased, TOURNANT decided to lie and secretly buy cheaper hedges that provided much less protection to investors. As alleged, TOURNANT and his co-***

– 30 –

*conspirators also provided investors with altered documents that were sent to investors to hide the true riskiness of the funds' investments, including that they were buying cheaper hedges.*

*In March 2020, following the onset of market dislocations brought on by the COVID-19 pandemic, the funds lost in excess of $7 billion in market value, including over $3.2 billion in principal, faced margin calls and redemption requests, and ultimately were shut down.* …

*The scheme alleged was an egregious, long-running, and extensive fraud that went undetected for years. It occurred at a very profitable component of AGI – one that accounted for 25% of AGI's revenue in recent years, which amounted to hundreds of millions of dollars.* As alleged, one of the ways TOURNANT carried out the fraud was by marketing the fact that he worked for a well-respected financial institution, AGI, which is a part of the Allianz SE ("Allianz") family. Allianz is one of the world's largest financial services companies and one of the world's largest insurance companies. *TOURNANT touted the protections provided by the funds' position within the global Allianz corporate structure, calling Allianz a "master cop" that would ensure that TOURNANT followed the risk guidelines promised to investors.*

*Despite TOURNANT's claim that Allianz acted as a "master cop" looking over his shoulder, no one at AGI or Allianz was verifying that TOURNANT and his colleagues were actually adhering to the investment strategies promised to investors. No risk or compliance personnel at AGI verified, attempted to verify, or were responsible for verifying that TOURNANT and his colleagues were purchasing hedging positions within the range that was represented to investors. Much of this historic fraud was made possible because AGI's control environment was not designed to verify that TOURNANT and his co-conspirators were telling investors the truth.* Because AGI, a registered investment adviser, failed to provide meaningful oversight, TOURNANT and his co-conspirators were able to deceive investors about the risks they were taking with their money.

*In addition, as alleged, in the summer of 2020, after the onset of the pandemic and in order to cover up the fraudulent scheme,*

– 31 –

**TOURNANT attempted to obstruct an investigation by the U.S. Securities and Exchange Commission (the "SEC") into the circumstances that led to the losses in March 2020.**

(Emphasis added.)

34.     Summarizing the charges, guilty pleas, and settlements, *The Wall Street Journal* published an article on May 17, 2022 entitled "Allianz Subsidiary Pleads Guilty to Defrauding Investors as Part of $6 Billion Settlement" which further provided the following in relevant part:

> **One of Allianz SE's [] U.S. investing divisions pleaded guilty to securities fraud and agreed to pay about $6 billion in penalties and restitution** to investors who suffered losses when some of the subsidiary's hedge funds tanked during the March 2020 market selloff.
>
> **Allianz Global Investors U.S. admitted Tuesday that it lacked internal controls and oversight for a series of private-investment funds and made false and misleading statements to investors**, according to a plea agreement reached with the Manhattan U.S. attorney's office. The U.S. subsidiary also settled civil-fraud claims brought by the Securities and Exchange Commission.
>
> The $6 billion will resolve the government's criminal and civil claims, as well as those from defrauded investors. **The agreement is among the largest criminal resolutions between a financial institution and the Justice Department in recent years.**
>
> *                *                *
>
> The case centered on Allianz Global Investors' Structured Alpha funds, which bet heavily on stock options that effectively sold insurance to other investors that were hedging against a potential market selloff. The strategy had been profitable during the market's calm stretch, and **Allianz managers had assured investors that they had hedged their own trades in the event that the markets turned volatile.**
>
> *                *                *

– 32 –

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> ***The Structured Alpha funds lost more than $7 billion in March 2020, according to the government. On March 25 of that year, Allianz informed investors that two of its funds would be liquidated.***
>
> \*       \*       \*
>
> ***Allianz said its guilty plea would disqualify Allianz Global Investors from advising U.S. mutual funds and certain pensions.*** The firm said it expects the SEC to issue waivers on Tuesday that would ensure the agreement wouldn't affect Allianz Life or its other U.S. money manager, Pacific Investment Management Co.
>
> \*       \*       \*
>
> ***Prosecutors said the Allianz scheme lasted from at least 2014 to March 2020 with Mr. Tournant reaping more than $60 million in compensation during that time.*** He and his team misled investors over the risks the funds were taking and how they were producing their returns, prosecutors alleged. The Structured Alpha managers also misrepresented the hedging strategies they had used to protect the funds' assets, prosecutors said.
>
> The government also alleged that Mr. Tournant sought to obstruct the SEC inquiry into the losses by directing Mr. Bond-Nelson to lie to the regulator.
>
> \*       \*       \*
>
> The men also misstated daily performance results sent to some investors, making returns look better than they were, the SEC said.
>
> (Emphasis added.)

35.     On this news, the Company's ADR price fell $0.57 per share, or 2.6%, to close at $20.80 per share on May 18, 2022, the next full trading day, damaging investors.

– 33 –

36.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Allianz during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the OTC Pink market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and

– 34 –

securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether Defendants' acts as alleged violated the federal securities laws;

(b)   whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)   whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   whether the Individual Defendant caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)   whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)   whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

– 35 –

impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

43. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the OTC Pink market, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

44. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

– 36 –

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

45.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     This Count is asserted against the Company and the Individual Defendant and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48.     During the Class Period, the Company and the Individual Defendant, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49.     The Company and the Individual Defendant violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

similarly situated in connection with their purchases of the Company's securities during the Class Period.

50.    The Company and the Individual Defendant acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

51.    The Individual Defendant, who was a senior officer of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements made by him or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

52.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendant's statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in

– 38 –

purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendant's false and misleading statements.

53.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendant's misleading statements and by the material adverse information which the Company's and the Individual Defendant did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

54.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

55.     By reason of the foregoing, the Company and the Individual Defendant have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendant

56.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.     During the Class Period, the Individual Defendant participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of his senior position, they knew the adverse non-public information regarding the Company's business practices.

– 39 –

58.     As an officer of the Company, the Individual Defendant had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

59.     Because of his position of control and authority as a senior officer, Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendant exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendant therefore, was a "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

60.     The Individual Defendant, therefore, acted as a controlling person of the Company. By reason of his senior management position, the Individual Defendant had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

61.     By reason of the above conduct, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: January 31, 2023            Respectfully submitted,


                                   **THE ROSEN LAW FIRM, P.A.**
                                   Laurence M. Rosen, Esq. (SBN 219683)
                                   355 S. Grand Avenue, Suite 2450
                                   Los Angeles, CA 90071
                                   Telephone: (213) 785-2610
                                   Facsimile: (213) 226-4684
                                   Email: lrosen@rosenlegal.com

                                   *Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS