Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WEIR, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>ALLIANZ SE, and ALLIANZ GLOBAL INVESTORS U.S. LLC,<br><br>    Defendants. | **Case No.** 2:23-cv-00719-DSF-MAA<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff David Weir ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, announcements, wire and press releases published by and regarding Allianz SE ("Allianz" or the "Company"), and information readily

obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who publicly traded Allianz ADRs between March 9, 2018 and May 17, 2022, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Allianz, through its subsidiary Allianz Global Investors U.S. LLC ("AGI US") managed a set of private funds following a strategy called "structured alpha". AGI US advertised these Structured Alpha Funds as safe investments that would provide consistent above market returns regardless of market conditions. To reassure investors of the safety of these investments, AGI US and Allianz boasted, both to Structured Alpha Fund investors and to public holders of their common stock and ADRs, of their "three lines of defense" risk management and compliance structure, involving both enterprise risk management personnel and internal audit functions that reported directly to the board of Allianz and therefore were independent of AGI US. In reality, however, those independent risk management functions totally failed to supervise the portfolio managers overseeing the Structured Alpha Funds, who in turn repeatedly provided falsified documents to their private fund investors for years, and engaged in riskier than disclosed investing strategies in the Structured Alpha Funds. As a result, when the COVID-19 pandemic rocked markets, the Structured Alpha Funds collapsed. Though AGI US and Allianz initially insisted that this collapse was simply due to forces outside of their control, ultimately the DOJ and the SEC uncovered the portfolio managers' fraud, leading AGI US to plead guilty to criminal securities fraud, and leading Allianz to pay over

– 2 –

$6 billion in fines and settlements with investors in the Structured Alpha Funds in 2022. When Allianz and AGI US eventually admitted Allianz's hefty civil liability and AGI US's criminal culpability, Allianz's common stock, and therefore its US traded ADRs, fell in price, damaging investors.

## JURISDICTION AND VENUE

3.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

4.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

5.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

6.     Defendant AGI US is subject to the personal jurisdiction of this Court pursuant to Section 27 of the Exchange Act because it is headquartered and incorporated in the United States.

7.     Defendant Allianz is subject to the personal jurisdiction of this Court because it purposefully directed its activities with to United States and residents of the United States, including Plaintiff, by making available English translations of its annual and periodic reports on its website, www.allianz.com. On its form F-6EF dated March 6, 2018, Allianz certified that it "publishes information in English required to maintain the exemption from registration under Rule 12g3-2(b) under the Securities Exchange Act of 1934 on its Internet Web site (www.allianz.com) or through an electronic information delivery system generally available to the public in its primary trading market." Allianz has continued to maintain such information on the website throughout the Class Period until the present day. Allianz also

– 3 –

participated in virtual investor conferences for US investment banks during the class period, including participating in the JP Morgan European Insurance Conference on June 16, 2020, the Bank of America Financials CEO Conference on September 22, 2020, the Bank of America European Credit Conference on November 24, 2020, the JP Morgan Global ESG Conference on March 24, 2021, the JP Morgan European Insurance Conference on June 15, 2021, and the Bank of America Financials CEO Conference on September 23, 2021.

8.     Allianz is also subject to the personal jurisdiction of the United States because it purposefully availed itself of doing business in the United States. On March 6, 2018, Allianz registered filed a form F-6EF to register a sponsored ADR program in the United States. JP Morgan Chase Bank, N.A. acted as depository. While Allianz terminated its sponsored ADR program as of January 3, 2020, JP Morgan launched an unsponsored ADR program and transferred all of the outstanding sponsored ADRs into unsponsored ADRs, and Allianz continued to facilitate the ADR program by publishing its annual and periodic financial statements on its website in English.

9.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

10.     Plaintiff, as set forth in his previously filed Certification, purchased Allianz's ADRs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

11.     The ADRs Plaintiffs reflecting Plaintiff's purchase and his beneficial ownership of the ADSs was issued by a depositary bank located in New York City, within the United States.

12.     Plaintiff's purchase of Allianz ADRs was directed by his brokerage firm, E*Trade, a broker located in Virginia. E*Trade purchased Allianz ADRs for Plaintiff on the OTC Pink, which is based in New York. Plaintiff therefore incurred irrevocable liability in the United States to purchase the shares he acquired during the Class Period, because the placement of the buy order and the transfer of title to the securities took place within the territorial jurisdiction of the United States.

13.     Defendant Allianz SE ("Allianz") together with its subsidiaries, provides property-casualty insurance, life/health insurance, and asset management products and services worldwide. Allianz refers to itself, together with its subsidiaries, as the "Allianz Group".

14.     Defendant Allianz is incorporated in Germany with its principal executive offices at Koeniginstrasse 28, Munich 80802, Germany. The Company's American depositary receipts ("ADRs") trade on the OTC Pink market under the ticker symbol "ALIZY." Throughout the class period until January 3, 2020, Allianz sponsored its ADR program. From January 3, 2020 onward, Allianz ADRs continued to trade in the US without Allianz sponsorship. From that time onward, the Bank of New York Mellon, a Delaware corporation, Citibank, NA, a national banking association, and Deutsche Bank Trust Company Americas, a New York company, acted as depositaries. Allianz, like most German companies, employs a two-tier board structure consisting of a Board of Management that is staffed by senior executives of the company, and a supervisory board that is composed of representatives of shareholders and workers and provides independent oversight to

– 5 –

the board of management. The supervisory board appoints the members of the board of management.

15.     The board of management is responsible for day-to-day management of Allianz and its subsidiaries. The supervisory board's primary task is to supervise the board of management

16.     Defendant Allianz Global Investors U.S. LLC   ("AGI US") is a Delaware limited liability company with offices at 1633 Broadway. New York, NY. It is a wholly owned indirect subsidiary of Allianz.

17.     The defendants are referred to herein, collectively, as the "Defendants."

## RELEVANT NON PARTIES

18.     The Structured Products Group was a group within AGI US. By 2020, it had eleven employees, with over $11 billion in assets under management under seventeen different funds following a strategy called "Structured Alpha." The funds that followed the Structured Alpha strategy will be referred to herein as "Structured Alpha Funds".  The SEC, in its complaint against Tournant, identified seventeen separate funds as "Structured Alpha Funds".[1]

---

[1] (1) AllianzGI Structured Alpha U.S. Equity 500 LLC; (2) AllianzGI Structured Alpha U.S. Equity 250 LLC; (3) AllianzGI Structured Alpha Large Cap Equity 350 L.P.; (4) AllianzGI Structured Alpha Global Equity 500 LLC; (5) AllianzGI Structured Alpha Global Equity 350 LLC; (6) AllianzGI Structured Alpha Emerging Markets Equity 350 LLC; (7) AllianzGI Structured Alpha 1000 LLC; (8) AllianzGI Structured Alpha 1000 Plus LLC; (9) AllianzGI Structured Alpha 1000 Plus Ltd.; (10) AllianzGI Structured Alpha 500 LLC; (11) Allianz SAS; (12) AllianzGI Structured Alpha U.S. Fixed Income 250 LLC; (13) AllianzGI Structured Alpha Multi-Beta Series LLC I – US Fixed Income Series; (14) AllianzGI Structured Alpha Multi-Beta Series LLC I – US Large Cap Series; (15) AllianzGI Structured Alpha Multi-Beta Series LLC I – US Small Cap Series; (16) AllianzGI Structured Alpha

– 6 –

19.     Gregoire P. Tournant served as the Chief Investment Officer ("CIO") of the U.S. Structured Products Group for AGI US and was the Lead Portfolio Manager for the Structured Alpha Funds. Tournant also served on the U.S. Executive Committee of AGI US.

20.     Trevor L. Taylor was a Managing Director at AGI US and served as Co-Lead Portfolio Manager of the Structured Alpha funds. Taylor assisted Tournant in managing the Structured Alpha Funds.

21.     Stephen G. Bond-Nelson was a Managing Director at AGI US and served as Portfolio Manager for the Structured Alpha Funds. Bond-Nelson also assisted Tournant in managing the Structured Alpha Funds.

## COMPANY BACKGROUND

22.     Allianz is a German multinational financial services company headquartered in Munich. Its main businesses are insurance and asset management. It was founded as Allianz AG, in Berlin in 1890. It entered the US markets in the early 1900s as an insurer.

23.     Allianz also entered the US markets as a money manager. It offered mutual funds and private investing services through its subsidiary AGI US.

## ALLIANZ SE'S OVERSIGHT AND CONTROL OVER AGI US

24.     Allianz SE's corporate filings explain the important role the ultimate parent company-Allianz SE-plays in establishing and enforcing the risk framework and procedures that failed in the case of the Structured Alpha Funds. For example, Allianz SE's Board of Management is charged with "setting business objectives and

Multi-Beta Series LLC I – International Equity Series; and (17) AllianzGI Structured Alpha Multi-Beta Series LLC I – US Long Credit Series.

– 7 –

the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system, including "risk controlling processes" set by the Board that required "regular reporting to [Allianz] Group". Board members of both Allianz SE and the Allianz Group also sat on a "Group Investment Committee" responsible for "implementing the Group investment strategy, including monitoring group-wide investment activities" and "approving investment-related frameworks and guidelines[.]" According to those filings, Allianz Group runs its "operating entities", including AGI US, that comprise its asset management division "via an integrated management and control process," which includes Allianz SE and its operating subsidiaries jointly reviewing the operating entities' "business strategies and goals." Those filings also state that "Allianz SE's central Group Compliance function is responsible – in close cooperation with local compliance functions – for ensuring the effective implementation and monitoring of the compliance programs within the Allianz Group as well as for investigating potential compliance infringements." In addition, Allianz deployed a "three lines of defense" internal control model and risk management model throughout the Allianz Group, including at AGI US, that is overseen by Allianz SE. Allianz SE, therefore, is not merely a holding company, but the entity that controls the overall strategy as well as risk management and compliance functions throughout the Allianz Group.

25.     Allianz described the three lines of defense model in great detail in its annual Solvency and Financial Condition Report for 2017. It explained that this model was a "core conceptual element of the internal control framework" that allows "for different and clearly distinguished levels of control with graduated control responsibilities."

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

26.     The first line of defense is "the management of day-to-day activities, of risks, and of risk controls. Key activities focus on the operational assessment of risks and returns by taking or by directly influencing the origination, pricing, and acceptance of risks, as well as implementing control standards to support the optimization of risks and returns."

27.     The second lines of defense consists of "the independent overseeing and challenging of the day-to-day risk-taking actions and controls performed by the first line." To ensure the effectiveness of the second line of defense, "key functions in charge are assigned certain competencies, such as independence vis-à-vis first-line responsibilities, a direct reporting line to the relevant Board of Management member, and the right to veto business decisions for important reasons." The second line of defense includes compliance, legal, risk management, and actuarial functions.

28.     The third line of defense is the internal audit function. "Its activities include, in particular, providing an independent assessment of the effectiveness and efficiency of the Internal Control System and issuing a report on the results of such assessment to the Board of Management member in charge."

29.     Allianz made clear that key to the effectiveness of the second and third lines of defense model is their ability to escalate issues to the board of management, and the fact that those executing the second and third line of defense functions directly report to a member of the Board of Management of Allianz SE.

30.     In the case of AGI US, the "second line of defense" was carried out by Investment Data Services GmbH, a separate wholly owned subsidiary of Allianz. The "third line of defense" was carried out by Allianz Asset Management, a separate wholly owned subsidiary of Allianz that describes itself as the "financial and governance holding company for the asset management business of Allianz SE". The chair of Allianz Asset Management throughout the class period until September

– 9 –

30, 2021 was Jacqueline Hunt, who also sat on the Allianz SE Board of Management throughout the class period until September 30, 2021.

31.    Allianz SE acknowledges that it exercises controlling power over AGI US and relies on AGI US's business activities in assessing its own solvency under applicable European insurance regulations. Specifically, according to Allianz Group's 2019 Solvency and Financial Condition Report, Allianz SE exercises a "dominant" influence over, has 100% voting rights in and capital share with, and uses 100% of the financials for the establishment of Allianz Group's consolidated accounts, confirming the ultimate control Allianz SE exerts over AGI US.

32.    The actual management and oversight of the Structured Alpha Funds, as well as the interrelationships between the related AGI Defendants here, followed the unified "global entity" Allianz portrayed to investors. The portfolio managers responsible for the Structured Alpha Funds-Tournant, Bond-Neslon, and Taylor-are Managing Directors at AGI US. Tournant, in turn, reports to Deborah Zurkow, Global Head of Investments at Allianz Global Investors, who is employed by Allianz Global Investors GmbH, UK Branch. Zurkow is specifically identified as an "associated person" of AGI US under the Investment Adviser Act of 1940 in AllianzGI's Form ADV filing. Chris Grix, Allianz Global Investors' U.S. Head of Risk, who reports to Wolfram Peters, Allianz Global Investors' Global Head of Risk, were both involved in overseeing the Alpha Funds performance.

33.    In addition, Allianz took an active role in resolving AGI US's legal problems as a result of its misconduct. According to a presentation by Allianz to the Department of Justice, Allianz agreed to pay settlements in the civil cases brought against AGI US in the wake of the collapse of the Structured Alpha Funds.

**THE STRUCTURED ALPHA FUNDS**

– 10 –

34.     The Structured Products Group within AGI US managed and marketed the Structured Alpha Funds.

35.     Each Structured Alpha Fund was supposed to track the performance of a specific benchmark, such as the S&P 500, while also outperforming the benchmark by a specific amount, using what is called an "alpha" trading strategy. The degree to which a specific fund was meant to outperform its benchmark, and the corresponding advertised level of risk, varied from fund to fund.

36.     The Structured Alpha strategy was supposed to achieve its excess, or "alpha" returns through an options trading strategy, which had three components. The first component, called "Range-Bound Spreads" required AGI US to use options to sell insurance against the market increasing or decreasing to a price level outside a range of current prices. If the funds stayed within a certain range of current market prices, the fund would collect premiums for selling that insurance without making payouts. This provided the bulk of the profits of the Structured Alpha Funds' returns.

37.     The second part of the Alpha Strategy was a set of "Directional Spread" trades, which were designed to profit if the market moved outside of the range at which the Range Bound Spreads would be profitable.

38.     The third part of the options trading strategy was a set of hedges designed to protect against a market crash. This component of the strategy involves buying a set of put options ranging in strike price from 10% to 25% below the current market price. In a significant market decline these would offset the losses from the other parts of the strategy if declines occurred that would otherwise cause the other parts of the strategy to lose money. While these would prevent losses in market crashes, at all other times the costs of purchasing the options would be a drag on profits. But because they could prevent losses in a downturn, AGI US called them a cornerstone of the strategy.

39.     Tournant led the Structured Products group and sat on the AGI US Executive Committee from March 2017 through 2019, when the committee was dissolved. Tournant was the highest or second highest compensated employee of AGI US every year from 2015 through 2019. He was assisted in managing the Structured Alpha Funds by Taylor and Bond-Nelson.

40.     In marketing the Structured Alpha Funds, AGI US and its officers repeatedly emphasized that it was subjected to stringent risk management standards, claiming that risk was "continuously managed and monitored at both the portfolio level by the investment team and at the firm level by Allianz SE. Tournant told investors that the funds managers considered themselves "risk managers first, return managers second."

41.     AGI US told investors that it employed the "three lines of defense" model: 1) at the business level, including portfolio management; 2) Enterprise Risk Management, legal and compliance; and 3) the Internal Audit Function. Tournant told a Structured Alpha investor in 2014 that Allianz SE was a "master cop" and claimed that he had "behind me one of the largest and most conservative insurance companies in the world monitoring every position that I take to make sure that from the legal, compliance and risk standpoint I'm well within the guidelines… which is very different than if I had my own hedge fund firm, where in some form or fashion I can overrule just about anything."

42.     AGI US also touted its relationship with Allianz on its website, stating that "[a]s part of the Allianz Group, Allianz Global Investors has a strong parent with a track record of strategic investment for the long term. With Allianz as an investor in many of our funds, our clients enjoy the confidence that comes from investing alongside one of the world's largest and most sophisticated investors."

## THE STRUCTURED ALPHA FRAUD

– 12 –

43.    In reality, AGI US was engaged in a years-long elaborate fraud in the management of the Structured Alpha Funds.

44.    According to the Criminal Information in *United States v. Allianz Global Investors U.S. LLC*, 22-cr-00279 (S.D.N.Y May 17, 2022) (the "AGI US Information"):

> Beginning in at least 2014 up to and including in or about March 2020, Allianz Global Investors U.S. LLC ("AGI US"), the defendant, engaged in a scheme to defraud investors in a series of private investment funds (collectively, the "Structured Alpha Funds," or the "Funds") that, at their height, had over $11 billion in assets under management. The scheme was carried out by, among others, the three portfolio managers with primary responsibility for managing the Structured Alpha Funds, specifically, Gregoire Tournant, Trevor Taylor, and Stephen Bond-Nelson (the "Portfolio Managers"). The investors that were the victims of the scheme included, among others, pension funds for teachers, religious organizations, bus drivers, and engineers. In particular, AGI US made false and misleading statements to current and prospective investors that substantially understated the risks being taken by the Funds, and also overstated the level of independent risk oversight over the Funds. AGI US also failed to disclose and sought affirmatively to withhold relevant risk information. AGI US did this in violation of its fiduciary duties as an investment adviser, including its duty of care and its duty of loyalty.

> AGI US Information ¶1.

45.    The AGI US Information acknowledged that AGI US as a whole failed in its compliance and risk management functions:

> The compliance and risk management functions at AGI US, the defendant, failed to maintain adequate oversight of the team managing the Structured Alpha Funds, despite AGI US's representations to investors that it had designed and maintained an independent risk management function to monitor and manage risk, as set forth more fully below. The Portfolio Managers were able to take advantage of these control failures to manage the Funds in a manner inconsistent with

– 13 –

representations to investors. The control failures also facilitated the Portfolio Managers' actions to deceive investors by hiding, and making affirmative misstatements about, risk over the course of years. The investigation has not revealed evidence that these control failures occurred within any other organizations that fall within the broader umbrella of the parent company Allianz SE.

*Id.* ¶3.

46.    The AGI US Information went on to state that after the market crash in March 2020 related to the COVID pandemic, the Structured Alpha Funds lost more than $7 billion.

47.    The AGI US Information provided a detailed description of AGI US's fraudulent scheme:

AGI US, the defendant, repeatedly represented to investors in marketing materials for the Structured Alpha Funds that risk was "continuously managed and monitored at both the portfolio level by the investment team and the firm level," and that the Funds had a specific set of hedging positions in place to protect against an overnight or short-term equity-market crash. Indeed, Tournant told certain investors that the Funds' managers considered themselves "risk managers first, return managers second." Despite these representations, however, AGI US, through the Portfolio Managers acting at the direction of Tournant, deployed an investment strategy that prioritized returns over effective risk management. The Portfolio Managers repeatedly failed to purchase the hedging positions that investors were promised. Further, the Portfolio Managers managed the funds belonging to their largest investor to higher risk targets than promised. Last, in many instances, when investors asked for documentation to assess the true risks of the portfolio and to guide their investment decisions, the Portfolio Managers fraudulently altered the data that was provided to investors in a way that consistently understated the magnitude of the risk to which the investors were exposed.

*Id.* ¶10.

48.     The AGI US Information went on to detail nine different types of fraudulent conduct that AGI US engaged in. The first related to hedging. The AGI US Information noted that the Structured Alpha Funds' "options strategy had three main components: (a) range-bound spreads; (b) directional spreads; and (c) hedging positions." *Id.* ¶11a. Starting "in October 2015, AGI US … consistently represented to investors in marketing materials that it would purchase hedges for the Funds that were -10 to -25% 'out of the money" to protect the portfolio against an overnight crash, as well as a short-term equity-market crash, typically defined as a decline of 10 to 15% in less than 5 days." *Id.* This, however, was untrue. In reality, "beginning in approximately late 2015, AGI US, at Tournant's direction, began purchasing certain hedges called 'tail risk hedges' for the Funds closer to a -10 to -45% , and at one point in 2018, as much as 66% out of the money." *Id.* As time went on, AGI US deviated further from their stated strategy. "[B]eginning in February 2018, tail risk hedges were purchased at strike prices that averaged between -30 to -50% out of the money." *Id.* Purchasing options that were further out of the money "were cheaper but also less protective in the event of a market downturn." *Id.*

49.     The Complaint in *SEC v. Tournant*, 22-cv-04016 (S.D.N.Y. May 17, 2022) ("SEC Complaint")[2] provided additional detail on this aspect of the fraud. It specified that "[f]rom at least July 2017 through March 2020, AGI US and Tournant misrepresented to investors – through pitch books and investor presentations – that Structured Alpha funds with alpha targets of 500 and above had a capacity limit of $9 billion. In fact, unknown to investors, AGI US exceeded the purported capacity

---

[2] On May 17, the SEC moved to approve Consent Judgments as to Taylor and Bond-Nelson. The court entered consent judgments as to Taylor and Bond Nelson on June 1, 2022.

limit." SEC Complaint ¶156. This is important because, after a certain point of scale, a particular investment strategy will have reduced returns. So investors will not want to invest in a strategy unless there is some assurance that there is some limitation on the capacity of that strategy (i.e. a limit to the assets under management). The SEC Complaint provides several examples of AGI's misstatements to investors about capacity limits. For instance, a Product Specialist emailed a pitch book to an investor on September 11, 2018. *Id.* ¶159. It showed that Structured Alpha Funds with a target of 500 or greater had a total capacity of $9 billion and were closed. *Id.* But AGI US did not adhere to the capacity limits, and did not close the funds when the limit was breached. *Id.* The SEC Complaint contained the following chart regarding the capacity of the Structured Alpha Funds.



*Id.* ¶161.

50.    Tournant personally approved investments in funds that were supposed to be closed. For instance, allowing a potential investor in December 2019 to invest more than $100 million in a closed fund. *Id.* ¶164. In February 2020 Tournant

– 16 –

allowed an investor to invest in another closed fund. *Id.* ¶165. To explain away why new investments were allowed in supposedly closed funds, product specialists falsely told investors that the new investments were allowed because old investors had pulled out. *Id.* ¶166. The SEC Complaint states that an AGI US employee made one such statement on May 10, 2019. *Id.* Tournant approved this statement. *Id.*

51.    The second part of the scheme related to so-called "Open Position Worksheets". AGI US Information ¶11b. Those work sheets showed every position in a fund's portfolio. Tournant and Taylor altered those worksheets before investor meetings. "Specifically, before meetings, Tournant and Taylor manually changed the worksheets to bring the strike distances of the hedges closer to the money. Because hedges that are closer to the money are worth more in a market decline, these alterations made the portfolio seem better hedged against a market downturn, and therefore less risky." *Id.* Altering those reports also "concealed that AGI US, the defendant, had abandoned its promise to maintain hedges in the Funds with strike distances in the range of -10 to -25% out of the money." *Id.* The AGI US Information provides one example: "in one instance Taylor altered a spreadsheet to change a hedge's strike distance from -45.01 to – 24.71%." In another instance. Tournant "removed certain positions from the open positions worksheet that he intended to show to an investor." *Id.* The AGI US Information explained that "changes had the effect of making the portfolio appear lower risk than it actually was." *Id.*

52.    The third part of the scheme related to Position Data. The AGI US Information explains that in one instance, manually tampered with data that was provided to a potential investor. "After the potential investor requested holdings data for a certain fund, Tournant took the accurate holdings data and changed 31 of the fund's 576 open positions from short positions to long positions, and then sent this fraudulent data to the potential investor." *Id.* ¶11c. The result of these changes "was

– 17 –

to fraudulently show a portfolio that was more protected against risk than the fund's actual portfolio." *Id.*

53.     According to the SEC Complaint, on January 28, 2019, Tournant sent an email to an AGI salesperson, to be forwarded to a prospective investor, attaching several spreadsheets including open position data that Tournant manipulated. SEC Complaint ¶129. "On one of the spreadsheets alone, Tournant made 75 alterations to the strike prices of SPX tail risk hedge long puts. Tournant increased the strike prices in amounts from $400 to $700 to show that the long puts were closer to in-the-money than they were in fact." *Id.* ¶130. In addition, for six "long put positions, Tournant raised the strike price from $1,000 to $1,250, which created the false impressions that the strike prices were less [out of the money] than they were in fact, and that the strike prices were closer to the ranges represented to investors in the Structured Alpha marketing materials." *Id.* ¶131. This altered data was provided to the investor.

54.     The SEC Complaint also details that "[o]n or around July 10, 2019, Taylor manipulated open positions data. Specifically, in open positions data prepared for an investor meeting, Taylor increased strike prices on TRHs[3] from $1,625 to $2,225, thus reducing strike distances from -45.01% to -24.71%" out of the money. SEC Complaint ¶133.

55.     The fourth part of the scheme related to false risk reports. "Risk reports were daily reports created by Investment Data Services GmbH - Analysis and Reporting Services ("IDS"), an affiliate of AGI US that was independent from the

---

[3] TRHs refer to "tail risk hedges" – put options designed to protect against extreme market moves.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Structured Products Group." AGI US Information ¶11d. IDS is, like AGI US, a wholly owned subsidiary of Allianz. Because, unlike the Portfolio Managers, the compensation of the IDS employees was not tied to the Funds' performance, their "independence was a feature that AGI US marketed to investors and was important as a protection against risk." *Id.* Allianz SE also touted the use of independent enterprise risk management throughout the Allianz Group. IDS provided daily risk reports for the Funds, including stress tests. These "modelled the impact of various one-day changes in the market on the Fund." *Id.* These reports were frequently provided to investors on request. However, "Tournant and Bond-Nelson altered over 75 risk reports that went to six investors, as well as to four consultants that advised approximately 35 additional investors." *Id.* They tampered with these reports by "among other things, manually changing certain 'stress test' results to make it appear that in significant one-day market downturns, the Funds would lose less money." *Id.* The AGI US Information provided additional examples. First, in one instance, "Bond-Nelson took a projected loss of - 30.82%, and cut it in half, to - 15.41%." *Id.* In another example, "Bond-Nelson took a projected loss of -30.95% and simply reduced it by 20, to a much lower projected loss of -10.95%." These reports "were then falsely presented to some investors as independently created reports generated by IDS, without disclosing the alterations." *Id.* The fact that Tournant and Bond-Nelson had to alter risk reports indicates that the actual risk reports showed that they were not following client instructions and the funds' advertised policies with respect to risk, and had to alter them to fool clients. The fact that the true risk reports that IDS itself generated showed that the Structured Products Group was violating these policies and instructions indicates that, contrary to Allianz's policy and the three lines of defense model, IDS was not checking those

reports against those fund policies, advertised strategies, client marketing communications, client reports or client instructions.

56.     The SEC Complaint explained that "from at least March 2018 through January 2020, while acting at Tournant's direction, Bond-Nelson manipulated numerous IDS Risk Reports sent to investors in order to conceal the true downside risk of Structured Alpha. Investors, however, did not know that the reports they received were altered." SEC Complaint ¶34. Bond-Nelson sent on the altered risk reports to Product Specialists within AGI US. *Id.* ¶35.Those Product Specialists then forwarded the materials to AGI US distribution personnel, who forward them on to investors. The SEC Complaint noted that "Bond-Nelson's material alterations of the IDS Risk Reports had no basis in fact and were designed to create the false appearance of lower downside risk for investors." *Id.* ¶36.

57.     The SEC Complaint detailed how Bond-Nelson manipulated the month end February 2018 IDS Risk Report for Structured Alpha, on March 5, 2018. "Specifically, for the AllianzGI Structured Alpha 1000 LLC fund, in one instance, Bond-Nelson materially reduced losses in a stress scenario from -22.0557450847078% to -12.0557450847078%." *Id.* ¶38. Bond-Nelson similarly altered "the outputs of stress test scenarios for the AllianzGI Structured Alpha 500 LLC fund, the AllianzGI Structured Alpha U.S. Equity 500 LLC fund, and the AllianzGI Structured Alpha Global Equity 350 LLC fund." *Id.*

58.     Bond-Nelson also altered the month-end March 2018 IDS Risk Report for Structured Alpha, first asking Product specialists to hold off on sending any month end reports to customers, stating that he needed to check something with Tournant. Later that day, Bond-Nelson forwarded manipulated risk reports that he had himself altered. "Specifically, Bond-Nelson altered the outputs of stress test scenarios for the AllianzGI Structured Alpha 1000 LLC fund: one entry from -

– 20 –

24.5987389395798% to -12.2993694697899%, and another from -30.8197078741882% to -15.4098539370941%. These altered amounts were exactly one-half of the actual IDS stress test outputs and had no basis in fact." *Id.* ¶41.

59.   Tournant also manipulated IDS Risk Reports by altering stress test results. *Id.* ¶42. On or around March 15, 2018, an AGI Product Specialist sent an email to Tournant that included historic stress test data. *Id.* Tournant then manipulated the data and emailed the altered data to the Product Specialist. *Id.* "In manipulating the data, Tournant changed over 150 entries in the IDS Risk Report data series. For example, in one alteration, Tournant reduced the losses of an IDS stress test output from -42.1505489755747% to -4.1505489755747% (i.e., he removed one digit)." *Id.* ¶ 43.

60.   The SEC Complaint goes on to state that Bond-Nelson continued to manipulate the Risk Reports from June 2018 through January 2020 before sending them to investors. During this period "Bond-Nelson materially altered IDS Risk Reports sent to investors for the following Structured Alpha funds: AllianzGI Structured Alpha 1000 LLC; AllianzGI Structured Alpha 1000 Plus LLC; AllianzGI Structured Alpha 500 LLC; AllianzGI Structured Alpha U.S. Equity 500 LLC; AllianzGI Structured Alpha Global Equity 500 LLC; and AllianzGI Structured Alpha Global Equity 350 LLC." *Id.* ¶47. The SEC Complaint explained that "Bond-Nelson, acting at Tournant's direction or with Tournant's knowledge, made more than 200 alterations to data in IDS Risk Reports and caused at least 87 materially altered IDS Risk Reports to be sent to investors or prospective investors. Bond-Nelson and Tournant knew, or were reckless in not knowing, that manipulating the IDS Risk Reports made those reports materially misleading." *Id.* ¶48.

61.     After the market decline in the wake of the Covid 19 pandemic, Bond-Nelson expressed concern to a Structured Alpha Product Specialist that he might face serious consequences for altering the reports. *Id.* ¶49.

62.     The fifth part of the scheme related to the "Greeks" – metrics used in finance to measure risk, and designated by letters of the Greek alphabet. "In general, these alterations were done to make the Funds appear less sensitive to market changes. Dozens of altered Greeks were sent to approximately nine investors and six consultants that advised approximately 35 additional investors." Information ¶11e. For instance, Delta measures the sensitivity of an option position to a change in the underlying asset. The SEC Complaint explains that Tournant and Bond-Nelson altered the greeks principally by lowering deltas, with Tournant altering at least 44 Greeks reports and Bond-Nelson altering at least 15. SEC Complaint ¶70. Bond Nelson sent these altered reports to Product Specialists. *Id.*

63.     For instance, on July 20, 2017, due to a request from a prospective investor, Tournant emailed Bond-Nelson a table with Historic Greeks for September 30, 2008 and October 31-2008, which was highly relevant to evaluating the downside risk of Structured Alpha since that time period coincides with the 2008 financial crisis. *Id.* ¶73. Before sending, Tournant "materially altered the historic Greek information in the table by reducing the 'Gross Long' and 'Net exposure' (i.e., net delta) by 20% for September 30, 2008. Specifically, Tournant, acting knowingly or recklessly, reduced 'Gross Long' from 129.76% to 109.76%, which had the effect of reducing 'net exposure' from 61.07% to 41.07%." *Id.* ¶74. Bond-Nelson emailed them to a Product Specialist who emailed them to the relationship manager for the investor, who sent them onto the investor. *Id.* ¶75. The investor then invested $150 million in the AllianzGI Structured Alpha Large Cap Equity 350 L.P. fund. *Id.* ¶76.

– 22 –

64.    In another instance, on October 11, 2017, Tournant sent a Product Specialist an email providing a daily Greek spreadsheet for a client. *Id.* ¶77. "In the spreadsheet, Tournant had materially manipulated daily Greeks for the dates with the five highest net deltas – August 10, 2017, August 11, 2017, August 17, 2017, August 18, 2017, and August 21, 2017 – by reducing the 'Gross Long (%)' and 'Net Delta (%)' by 10%." *Id.* ¶78. These were sent on to the institutional investor. *Id.*

65.    On April 11, 2018, Bond-Nelson sent Tournant another spreadsheet providing Greeks for the first quarter of 2018. *Id.* ¶81. The next day, the two discussed the spreadsheet and Bond-Nelson sent a revised version of the spreadsheet to Product Specialists. *Id.* "In the revised spreadsheet, at Tournant's direction, Bond-Nelson had reduced the gross long, gross short, and net delta figures for February 8, 2018 – the date with the highest net delta. As a result, the net delta dropped from its actual value of 112.42321916134% to a false value of 89.938575330507%." *Id.* These were then sent on to a relationship manager for distribution to the investor. *Id.* ¶82.

66.    On February 14, 2018, Tournant requested data from the portfolio management team to develop bullet points to explain how recent market volatility compared to an earlier period. *Id.* ¶83. An employee emailed a file containing historical Greeks, which Tournant then manipulated. "Specifically, he lowered the February 8, 2018 net delta value from 112.423219163134% to 72.423219163134%.... Tournant also reduced the net delta for February 9, 2018, from 63.4216821006926% to 53.4216821006926% – a reduction of 10%. Tournant knew, or was reckless in not knowing, that his reductions had no basis in fact and rendered the data materially false and misleading." *Id.* ¶84.

67.    On January 7, 2019, Bond-Nelson sent Tournant an email containing daily Greeks for the fourth quarter of 2018, and then later that day, at Tournant's

– 23 –

direction, sent a revised version that had manipulated data, as set forth in the following chart:

**Actual Greeks**

| Date | Gross Long (%) | Gross Short (%) | Net Delta (%) |
|---|---|---|---|
| 12/21/2018 | 133.99% | -39.03% | 94.96% |
| 12/24/2018 | 165.21% | -40.55% | 124.66% |
| 12/26/2018 | 115.00% | -31.40% | 83.60% |
| 12/27/2018 | 118.02% | -31.08% | 86.95% |
| 12/28/2018 | 103.88% | -22.27% | 81.62% |
| 12/31/2018 | 83.76% | -9.07% | 74.69% |

**Greeks Altered by Bond-Nelson**

| Date | Gross Long (%) | Gross Short (%) | Net Delta (%) |
|---|---|---|---|
| 12/21/2018 | 120.99% | -39.03% | 81.96% |
| 12/24/2018 | 140.21% | -40.55% | 99.66% |
| 12/26/2018 | 84.00% | -31.40% | 52.60% |
| 12/27/2018 | 82.02% | -31.08% | 50.95% |
| 12/28/2018 | 66.88% | -22.27% | 44.62% |
| 12/31/2018 | 46.76% | -9.07% | 37.69% |

*Id.* ¶87.

68.    Bond-Nelson later sent the altered information to Product Specialists for forwarding to an institutional investor. *Id.* ¶89.

69.    The sixth part of the scheme related to performance data. "Tournant, Bond-Nelson, and in one case other members of the Structured Products Group, altered daily performance data that went to at least three investors by 'smoothing' the data to reduce the magnitude of the largest losses as well as the gains on surrounding dates as a counterbalance." AGI US Information ¶11f. The effect of this scheme was to make it appear "as though the Funds were less responsive to market downturns, and therefore less risky in the event of such a downturn." *Id.* The AGI

– 24 –

US Information provided a specific example: "in or about July 2016, Tournant directed members of the Structured Products Group to send daily performance data that he had smoothed to an investor in the Funds." *Id.* Specifically, "Tournant changed the daily performance number for August 24, 2015, a notable market downturn, from -18.26% to -9.26%. This made the Funds appear less sensitive to the late August 2015 market volatility." *Id.*

70.   The SEC Complaint provided additional detail on this aspect of the fraud, providing several specific examples. In June of 2016, "a prospective investor asked AGI US to provide daily returns for AllianzGI Structured Alpha 1000 Plus since its inception in August 2012. After receiving that request, a Product Specialist forwarded the daily returns to Tournant in a spreadsheet and asked, 'Are you comfortable with us sending this externally to [the investor]?'" SEC Complaint ¶54. Tournant, on July 2, 2016, sent a version of the spreadsheet back to the Product Specialist to provide to the investor, but only after altering the performance data. *Id.* ¶55. The SEC Complaint provides the following example:

| Date | Return (Gross of fees) | Return Altered by Tournant | Difference |
|------|------------------------|----------------------------|------------|
| August 20, 2015 | -3.38764791658818 | -1.38764791658818 | +2% |
| August 21, 2015 | -5.42035375667693 | -3.42035375667693 | +2% |
| August 24, 2015 | -18.2607085709004 | -9.2607085709004 | +9% |
| August 25, 2015 | 5.35176329960697 | 1.35176329960697 | -4% |
| August 26, 2015 | 8.37147093860846 | 1.27147093860846 | -7.1% |
| August 27, 2015 | 3.39933596785672 | 1.29933596785672 | -2.1% |
| August 28, 2015 | 0.703163407972238 | 0.203163407972238 | -0.5% |
| August 31, 2015 | 0.171816106022435 | 0.071816106022435 | -.0.1% |

*Id.* ¶56.

71.   The AGI Product Specialist sent the altered spreadsheet to an investor. *Id.* ¶57.

72.   In another instance, a US consulting firm was considering whether to invest in AllianzGI Structured Alpha U.S. Equity 250 LLC fund. *Id.* ¶58. On or about

– 25 –

September 30, 2016, a representative of the firm asked for daily performance data from a Product Specialist. *Id.* On October 7, 2016 Tournant sent a spreadsheet to the Product Specialist, after manipulating data to "smooth" the returns. *Id.* ¶59. "Tournant manipulated 95 entries on the spreadsheet (29 in 2010, 44 in 2011, 2 in 2012, 13 in 2014, and 7 in 2015). In one alteration, for example, Defendant Tournant reduced the losses for August 8, 2011 from -15.8613360141283% to -10.8613360141283%." *Id.* ¶60

73.    On May 15, 2019, a Product Specialist again requested daily return data to send to an investor regarding the AllianzGI Structured Alpha 1000 Plus daily returns. Tournant again sent an altered version of the spreadsheet. "His alterations to the daily performance data had no basis in fact, and thus made them materially false and misleading. For example, Tournant reduced losses for August 24, 2015 from -12.78% to -7.78%." *Id.* ¶63.

74.    On March 2, 2020, a family office investor in AllianzGI Structured Alpha 1000 Plus Ltd. Requested daily returns since inception. *Id.* ¶64. Bond-Nelson forwarded an email that he had sent to Tournant "attaching the spreadsheet called 'Allianz Global Investors Structured Alpha 500 – Daily Returns Sept 2005 – December 2019.xlsx.' Bond-Nelson knew that the performance data on the spreadsheet had been materially altered, or 'smoothed,' at Tournant's direction, and was thus materially false and misleading." *Id.* ¶65. The SEC Complaint reveals that "[o]n March 3, 2020, a Structured Alpha Product Specialist sent an email to other Product Specialists, referencing prior communications with the family office investor and stating: 'OK, just found this. We definitely sent smoothed numbers.'" *Id.* ¶66.

75.    The seventh part of the scheme related to "attribution data": "Tournant altered certain attribution data that showed the portfolio's gains and losses attributed

to the three prongs of the strategy, to make it appear as though the portfolio had more significant hedging positions than were in fact in place." AGI US Information ¶11g. The Product Specialist sent this on to the consulting firm. The SEC Complaint stated that Tournant was primarily responsible for creating the attribution data that was shared with investors, and that he prepared the data with little to no oversight or review.

76.    On August 29, 2017, an investor asked for AGI US to provide "[r]eturn and risk broken down by the three sub-strategies, and in turn broken down for the type of option / financial instrument." *Id.* ¶95 Tournant provided an attribution spreadsheet that manipulated "hedging data to misrepresent the amount of money the portfolio management team was spending on hedging positions." *Id.* ¶96. The following table shows the alterations:

| Date | Actual | Altered by Tournant | Difference |
|---|---|---|---|
| July 2017 | -.023291582278481 | -.133291582278481 | 11 basis points |
| August 2017 | -.025635805907173 | -.125635805907173 | 10 basis points |
| September 2017 | -.037074345991561 | -.127074345991561 | 9 basis points |

*Id.*

77.    In addition, "Tournant materially altered the 'Short Term Directional Puts' data for July 2017, August 2017, and September 2017, by manipulating digits to conceal the true amounts from investors." *Id.* ¶98. With Tournant's knowledge, AGI US investors emailed the altered spreadsheets to an institutional investor. *Id.* ¶99.

78.    Tournant manipulated the data for the following quarter to send to the same institutional investor. *Id.* ¶101. "Specifically, Tournant knowingly or recklessly fabricated the 'Tail Hedging Indices' for October, November, and December of 2017, without any factual basis, making the figures materially false and misleading." *Id.*

– 27 –

79.     Tournant prepared attribution spreadsheets in the following quarters that similarly contained falsified data. *Id.* ¶103. "For example, for June 2019, July 2019, and September 2019, Tournant knowingly or recklessly prepared attribution spreadsheets that contained 'Tail Hedging Indices' of -.1244868768 – i.e., the exact same amount – which was not accurate or based in fact." *Id.*

80.     On or about January 8, 2020, Tournant emailed Product Specialists multiple spreadsheets for investors, including attribution spreadsheets with falsified data. *Id.* ¶107

81.     The eighth part of the scheme related to "Expected Value Sheets": "Tournant and Taylor changed expected value ("EV") sheets that were shown to certain investors during meetings, so that the potential losses on certain positions appeared smaller." AGI US Information ¶11h. The AGI US Information explains that the EV sheets provided predictions about "how the different positions in the Funds' portfolio could perform if the market went up or down by a specific percentage." *Id.* These were provided "during client meetings, as one example of how the portfolio managers monitored the portfolio and associated risk." *Id.* The EV sheets showed that under some circumstances "certain positions were projected to lose significant amounts of money." *Id.* However, "Tournant and Taylor manually altered certain EV sheets to decrease projected losses that they felt appeared too large." *Id.* As with their other alterations, "the alteration of EV Sheets understated the magnitude of the downside risk of the strategy." *Id.*

82.     The SEC Complaint provided additional details regarding this aspect of the fraud.

83.     In July 2017, an investor was conducting due diligence. SEC Complaint ¶111. Tournant planned to meet with the investor on July 18, 2017. *Id.* ¶112. On that morning, Tournant created a spreadsheet containing actual EV data, then

– 28 –

manipulated the data to increase gains and decrease losses. "Specifically, Tournant multiplied the gains by 1.4 (increasing the gains), and the losses by .25 (reducing the losses). He then emailed the altered spreadsheet to another AGI US employee for use in the investor meeting." *Id.* ¶112.

84.    On August 5, 2017, Taylor emailed Tournant step-by-step instructions on how to alter data and avoid detection in EV Sheets. *Id.* ¶115. The instructions specified "3) On a blank sheet in that workbook, copy and paste the ENTIRE EV SHEET THEREBY DUPLICATING IT EXACTLY." *Id.* After copying it, it instructed Tournant to alter the data: "7) On the new sheet target appropriate EV's and simply apply formulas you desire and copy up or down." *Id.* It also instructed Tournant to hide the accurate data: "If you believe the investor will not ask you to toggle to another portfolio (like SA1000 or Plus) – copy, paste special value the sheet so its [sic] fixed, hide the original EV sheet and your [sic] done." *Id.*

85.    The day after Taylor sent Tournant the instructions, Taylor sent an EV Sheet with the actual data, and falsified data for an investor meeting. For example, for more than ten entries, Taylor multiplied the actual potential losses by .15 to lessen, or minimize, the apparent downside of the investment strategy. Among other things, Taylor materially changed the maximum potential losses from the actual figure of $4,786,991, to $718,049. *Id.* ¶118.

86.    On December 1, 2018, in preparation for an investor meeting, Taylor emailed himself a spreadsheet with falsified EV figures. "For example, for more than 20 entries, Taylor multiplied the actual potential losses by .2 to reduce the losses. Among other things, Taylor materially changed the maximum potential losses from the actual figure of $2,343,502, to $468,700." *Id.* ¶121.

87.    The final part of the scheme related to "Variable Alpha Target Funds" AGI US entered into agreements with the Funds' largest investor to set up "variable

– 29 –

alpha target funds". AGI US Information ¶11i. These were funds whose alpha targets would vary over time. "The agreement originally provided that in a lower-volatility situation, the variable alpha target funds would be managed using a lower alpha target; in a higher volatility situation, a higher alpha target would be used." *Id.* This was supposed to protect the investor from downside risk. But AGI US violated this agreement, pursuing a greater than agreed upon target than promised. Then, Tournant provided "fraudulent reports during meetings that showed the variable alpha funds being managed to a lower alpha target than was in fact the case." *Id.* "This deviation in strategy exposed Investor-1 to greater financial risk than Investor-1 had agreed to assume." *Id.* The SEC Complaint explained that this investor was an ERISA plan administrator and referred to this investor as Client A. The Complaint will refer to this investor as "Investor 1".

88.     Investor 1 and AGI US entered an "Amended and Restated Investment Side Agreement" which, among other things "empowered [AGI US] to exercise full discretion in the management of the investment transactions [for Investor 1], subject only to any restrictions set forth in the Fund Documents." SEC Complaint ¶136. Investor 1 became concerned over the downside risks of the Structured Alpha strategy and considered reducing its investment. *Id.* ¶137. Tournant was able to persuade Investor 1 to stay with AGI US after proposing a risk mitigation program. *Id.* In January 2016, AGI US and Investor 1 executed an amendment to the investment strategy that adjusted the alpha targets according to the level of the CBOE Volatility index, the VIX, which measures market expectations of volatility. *Id.* ¶138. This agreement was designed to increase the Alpha Target as the VIX increased. *Id.* ¶140. This meant that the strategy would seek to outperform the index the more volatile the market got. Tournant was responsible for implementing this strategy. Under Tournant's leadership, the portfolio management team deviated

from the agreed upon strategy for Investor 1 by seeking alpha targets well above what was represented to Investor 1. *Id.* ¶142. Tournant even created internal spreadsheets that tracked the difference between the agreed upon targets, and the actual targets being used. It appears below.

| Grid Actual | | Grid Agreed | |
|---|---|---|---|
| VIX | Net Alpha | VIX | Net Alpha |
| <15 | 550 | <15 | 450-500 |
| 15 to 20 | 650 | 15 to 20 | 500 |
| 20 to 25 | 750 | 20 to 25 | 600 |
| 25 to 30 | 800 | 25 to 30 | 700 |
| > 30 | 800-1000 | > 30 | 750-1000 |

*Id.*

89.     By mid 2018, rather than using that grid to determine alpha targets, Tournant caused the portfolio management team to use the aggressive target of 750. *Id.* ¶143.

90.     To conceal his actions, Tournant provided Investor 1 with written reports misrepresenting the alpha targets that AGI US was using. Tournant provided spreadsheets to Investor 1 that understated the riskiness of the investments. *Id.* ¶145. "Beginning no later than October 2016, Tournant sent versions of the variable alpha target spreadsheet data on a quarterly basis to a member of the human resources group at AGI US." *Id.* ¶148. On April 25, 2019, a member of the performance group at AGI US requested monthly data on the alpha target that was being used. This data contained falsified information. *Id.* The SEC Complaint provided a chart showing actual vs falsified target data.



*Id.* ¶149.

91.    The AGI US Information noted that AGI US did not charge a management fee for the Alpha Sector Funds, but instead charged a performance fee of 30%, with Tournant and Taylor receiving a cut of that performance fee, each receiving $13 million in 2019. "As a result of this compensation structure, the Portfolio Managers earned higher pay by taking greater risk with the Funds' money to generate larger performance fees." AGI US Information ¶12.

92.    The AGI US Information went on to detail the lax oversight at AGI US that allowed the fraud to continue unencumbered for years. The AGI US Information noted that "AGI US lacked sufficient internal controls and oversight for the funds. This is despite the fact that the Structured Products Group contributed approximately one-quarter of AGI US's revenue during at least 2016 through 2019." *Id.* ¶13.

93.    The AGI US Information explained that AGI US made false representations to investors regarding its risk management:

– 32 –

AGI US, the defendant, assured investors in marketing materials that risk was "continuously managed and monitored at both the portfolio level by the investment team and at the firm level." AGI US described itself as having "three lines of defense": (i) the business, including portfolio management and sales; (ii) Enterprise Risk Management ("ERM"), Compliance and Legal departments; and (iii) an Internal Audit function. In a 2014 meeting, Tournant falsely told one investor that the Funds had "very strict controls" and described AGI US's parent company, Allianz, as a "master cop," noting that he had "behind me one of the largest and most conservative insurance companies in the world monitoring every position that I take to make sure that from legal, compliance, and risk standpoint that I'm well within the guidelines. which is very, very different than if I had my own hedge fund firm, where in some form or fashion I can overrule just about anything."

Despite these representations no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised Investor-1, despite the fact that the materials containing these representations were reviewed and approved by the AGI US Legal and Compliance departments. Further, client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance. Indeed, Compliance, ERM, and Legal were unaware that many of the reports described above were being sent to investors at all, with or without alterations. The Portfolio Managers thus were able to employ more aggressive investment strategies than they had told investors they would employ and thereby exposed investors to undisclosed risk. The ability of the Portfolio Managers to deviate from the representations that had been made to investors was possible, in part, because of fundamental failures in AGI US's controls as they related to the Funds. AGI US should have designed these controls to prevent the portfolio managers from putting their interests above those of their clients.

*Id.* ¶¶14-15.

– 33 –

94.     Moreover, The AGI US Information revealed that *nobody* was tasked with monitoring whether AGI US was "adhering to its representations to investors in the management of the Funds".

> For example, no risk or compliance personnel were responsible for confirming that AGI US was maintaining hedges for the funds within the -10 to -25% range that was represented to investors. As another example, risk and compliance personnel did not monitor the Funds' adherence to the alpha targets promised to Investor-1, the Funds' largest investor, even though compliance and legal personnel were aware of the Funds' undertakings with respect to Investor-1's alpha targets. Because no one in the control function at AGI US was verifying that investors were getting the risk mitigation they had been promised, Tournant was able to deceive investors regarding their risk exposure, exposing the Funds to much greater risk than what was promised to investors.

> *Id.* ¶16.

95.     In addition, AGI US misled investors in its claim "that an 'independent enterprise risk management function' operated as the second line of defense and provided 'independent portfolio risk oversight.'"

> AGI US also advertised to investors that the independent ERM function was providing this oversight by, among other things, monitoring daily risk reports created by IDS, an "independent service provider." However, in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors. Investors were thus misled regarding the independence of certain risk reports that they received. Because AGI US's controls system did not review existing client reporting at all, AGI US failed to detect that individuals at the Funds were sending these reports to investors, much less that they were sending altered reports.

> *Id.* ¶17.

96.     The AGI US Information also details how AGI US misled investors as to the third line of defense – audits.

> Internal Audit conducted an audit of the Structured Products Group in 2017. Although that audit identified red flags that, if pursued, might have led to identification of at least certain aspects of the fraudulent scheme, no meaningful follow up was conducted. Specifically, in 2017 an internal audit of the Structured Products Group identified certain inaccuracies in pitch books, namely, outdated references to certain risk metrics. Although the audit report "highlighted the need to thoroughly review marketing materials to ensure that the disclosure language[] accurately reflect the on-going investment processes," the audit did not trigger a review of the accuracy of the representations in investor materials by anyone outside the Structured Products Group. Instead, Internal Audit assigned that review to the product specialists within the Structured Products Group, whose compensation was directly tied to the quarterly performance of the Funds. Had an independent review occurred, AGI US's control function could potentially have uncovered at least the misrepresentations regarding the hedging positions.

*Id.* ¶18.

97.     The AGI US Information went on to explain that AGI US's failure to address data quality issues in back-office functions allowed the fraud to continue undetected.

> Multiple AGI US employees within the Structured Products Group who were not directly involved in the fraudulent scheme were aware that Tournant and Bond-Nelson were altering numbers on certain reports before sending them to investors. To cover up their wrongdoing, Tournant and Bond-Nelson explained to their fellow employees in the Structured Products Group that they were simply correcting "errors" in reporting generated by back-office functions. Because there were, in fact, ongoing issues with the back office's data reporting, multiple members of the Structured Products Group who might otherwise have reported the fraudulent scheme instead accepted this (fictional) explanation, and carried on with their work.

*Id.* ¶19.

– 35 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

98.    This insufficient oversight also contributed to investor losses. The AGI US Information explains that "the Portfolio Managers were required to provide capacity reports to the AGI US Product Committee on a quarterly basis." However, "the Committee did not exercise meaningful oversight over the Funds' adherence to capacity limits." *Id.* ¶20. As an example, The AGI US Information stated that "despite reporting assets under management that exceeded the Funds' capacity limits, the Product Committee never recommended that the Funds reduce capacity or stop accepting additional investments." *Id.* In addition, "although the Product Committee had closed certain funds to new investors because of capacity limits, Tournant nonetheless permitted new investors to invest in those funds." *Id.* In essence, Tournant "exercised discretion and decision-making authority over the Funds' capacity limits, including increases to those limits." *Id.*

99.    In the early days of the COVID pandemic in March of 2020, the Structured Alpha Funds declined in value precipitously, with five Structured Alpha Funds losing between 49% and 97% of their value, and two funds being liquidated in March of 2020.

100.    AGI US pled guilty to securities fraud on May 17, 2022. In the course of pleading guilty, AGI US admitted in open court that:

> From approximately 2014 to 2020, AGI US, through three portfolio managers, knowingly and willfully engaged in a scheme to defraud investors in the Structured Alpha Funds through false and misleading statements that substantially understated the risks being taken with respect to the Funds' investments.  The portfolio managers failed to purchase the hedging positions that were represented to investors, fraudulently altered the data in reports sent to certain clients, and often managed the largest investor's funds to higher alpha targets than they agreed they would do.

> The portfolio managers engaged in these misrepresentations in connection with investors' purchase and sale of securities.  They used

– 36 –

numerous means and instruments of communication in interstate commerce in connection with this conduct, and they intended that this conduct, at least in part, would benefit AGI US, as the misrepresentations were designed to induce investors to invest, or maintain their investments, in the Structured Alpha Funds. Numerous acts in furtherance of this unlawful activity occurred within the Southern District of New York.  The portfolio managers acted within their authority and scope of employment with respect to these matters, whose performance was generally entrusted to them by AGI US. In addition, AGI US overstated the level of independent risk oversight over the Structured Alpha Funds and failed to disclose relevant risk information.  The compliance and risk management functions failed to maintain adequate oversight over the Structured Products Group, and the three portfolio managers used these control failures to further deceive investors.

101.   On July 12, 2023, the United States District Court for the Southern District of New York entered judgment against AGI US, fining the company $2,331,189,703.78, against which it credited $1,887,550,009 in payments made to investors in the Structured Alpha funds, and a $675 million monetary penalty paid by AGI US to the SEC, and restitution of $3,238,748,199.69. According to a presentation made by attorneys for AGI US to the US Department of Justice, made public through filings in the criminal case against Tournant, Allianz itself made the settlement payments to the Structured Alpha Fund investors and offered to pay a fine on behalf of AGI US.

## **MATERIALLY FALSE AND MISLEADING STATEMENTS**

102.   On March 9, 2018, Allianz published the annual report  for the Allianz Group[4] for 2017 (the "2017 Group Annual Report"). The 2017 Group Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

**OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT**

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. **These standards ensure the accurate and timely flow of risk-related information and a disciplined approach towards decision-making and execution at both the global and local level.**

**As a general principle, the "first line of defense" rests with business managers in the related undertaking. They are responsible for both the risks and returns from their decisions. Our "second line of defense" is made up of independent global oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board in defining the risk frameworks within which the business can operate. Audit forms the "third line of defense", independently and regularly reviewing risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework.**

(Emphasis added)

103.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha

---

[4] Under German law, publicly traded companies that own subsidiaries are required to file two annual reports. One for the publicly traded parent itself, and one for the "Group" – that is, the parent and all subsidiaries.

Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors." The statement was also misleading as to the "third line of defense", audits, because Allianz's Internal Audit group conducted an audit of the Structured Product Group of AGI US, and even though "that audit identified red flags that, if pursued, might have led to identification of at least certain aspects of the fraudulent scheme, no meaningful follow up was conducted." Therefore, the statement above was misleading.

104.   The 2017 Group Report also stated:

Allianz has developed a consistent operational risk management framework, which is applied across the Group and focuses on early recognition and proactive management of material operational risks. The framework defines roles and responsibilities as well as management processes and methods: Local risk managers, in their capacity as the "second line of defense", identify and evaluate relevant operational risks and control weaknesses via a dialog with the "first line

– 39 –

of defense", report operational risk events in a central database, and ensure that the framework is implemented in their respective operating entity.

This framework triggers specific mitigating control programs. For example, compliance risks are addressed via written policies and dedicated compliance programs monitored by the Group Compliance function at Allianz SE. The risk of financial misstatement is mitigated by a system of internal controls covering financial reporting.

105.    The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors."

106.    On March 9, 2018, Allianz SE published its annual report for 2017 (the "2017 Allianz SE Annual Report"). The 2017 SE Annual Report stated the

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

**OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT**

A comprehensive system of risk governance is achieved by setting standards related to the organizational structure, the risk strategy and appetite, limit systems, documentation, and reporting. **These standards ensure the accurate and timely flow of information and a disciplined approach towards decision-making and execution.**

**As a general principle, the "first line of defense" rests with business managers in the business units of Allianz SE. They are responsible for both the risks and returns from their decisions. Our "second line of defense" is made up of independent oversight functions including risk, actuarial, compliance, and legal, which support the Board in defining the risk framework within which the business can operate.**

**Audit forms the "third line of defense", independently reviewing Allianz SE's risk governance implementation and compliance with risk principles. It performs quality reviews of risk processes, and tests adherence to business standards, including the internal control framework .For [sic] the first and the second line of defense, Allianz SE has established dedicated responsibilities at its departments (including reinsurance).**

**(emphasis added).**

107.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement

– 41 –

was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors." The statement was also misleading as to the "third line of defense", audits, because Allianz's Internal Audit group conducted an audit of the Structured Product Group of AGI US, and even though "that audit identified red flags that, if pursued, might have led to identification of at least certain aspects of the fraudulent scheme, no meaningful follow up was conducted." Therefore, the statement above was misleading.

108.   In the first quarter of 2019 AGI US published on its website a document titled "Allianz Structured Alpha US Equity 250" for Q4 of 2018 (the "AGI Q4 Commentary"). The document was labeled "Fund manager commentary" and was attributed to Tournant. It stated, in pertinent part:

> We missed our alpha target and delivered negative returns for the year, an outcome we view as disappointing. At the same time, we managed option portfolio risk well, minimized the damage for our investors, and kept the option strategy in position to recover and pursue positive excess returns in 2019.

109.    The foregoing statement was misleading for failing to disclose that AGI US was disregarding its option portfolio risk policies, and disregarding its option strategy in managing the Structured Alpha US Equity 250 Fund.

110.    The AGI Q4 Commentary also stated:

If the equity market can stabilize, regardless of direction, and the VIX can avoid a return to the low teens, Structured Alpha's option portfolio could have a favourable environment in which to pursue profits in the year ahead.

111.    The foregoing statement was misleading for failing to disclose that Structured Alpha's option portfolio was not structured to pursue profits in the event of a market downturn.

112.    The AGI Q4 Commentary also stated:

Allianz Structured Alpha US Equity 250 underperformed in the fourth quarter amid a severely fluctuating equity market and a comparatively subdued implied-volatility environment. While it was one of the most difficult periods the strategy's option portfolio has ever had to contend with, we were able to manage its risk well.

113.    The foregoing statement was misleading for failing to disclose that AGI US was not executing the option portfolio strategy as promised to investors.

114.    On March 7, 2019 Allianz published the annual report for the Allianz Group for 2018 (the "2018 Group Annual Report").  The 2018 Group Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. **These standards ensure the accurate and timely flow of risk-related information and a**

– 43 –

**disciplined approach towards decision-making and execution at both the global and local level.**

**As a general principle, the "first line of defense" rests with business managers in the related undertaking. They are responsible for both the risks and returns from their decisions. Our "second line of defense" is made up of independent global oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board in defining the risk frameworks within which the business can operate. Audit forms the "third line of defense", independently and regularly reviewing risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework.**

(emphasis added).

115.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were

– 44 –

able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors." The statement was also misleading as to the "third line of defense", audits, because Allianz's Internal Audit group conducted an audit of the Structured Product Group of AGI US, and even though "that audit identified red flags that, if pursued, might have led to identification of at least certain aspects of the fraudulent scheme, no meaningful follow up was conducted." Therefore, the statement above was misleading.

116.   The 2018 Group Report also stated:

Allianz SE has implemented the group-wide operational risk management framework that focuses on the early recognition and proactive management of material operational risks. The framework defines roles and responsibilities as well as management processes and methods. An important component of this framework is the Integrated Risk and Control System (IRCS), which ensures that effective controls or other risk mitigation activities are in place for all significant operational risks. Risk managers in the Allianz SE risk management function, in their capacity as the "second line of defense", identify and evaluate relevant operational risks and control weaknesses via a dialog with the "first line of defense", and in close interaction with both the other "second line of defense" functions at Allianz SE and with the audit function.

In the IRCS approach, risk identification, assessment and controls vary between the different operational risk sources reporting, compliance and operations. For example, compliance risks are addressed via written policies. The risk of financial misstatement is mitigated by a system of internal controls covering financial reporting.

117.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha

– 45 –

Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors."

118. On March 7, 2019, Allianz SE published its annual report for 2018 (the "2018 Allianz SE Annual Report"). The 2018 Allianz SE Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

**OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT**

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. **These standards ensure the accurate and timely flow of risk related information and a disciplined approach towards decision making and execution.**

**As a general principle, the "first line of defense" rests with business managers in the business units of Allianz SE (solo). They are responsible for both the risks and returns from their decisions. Our "second line of defense" is made up of independent oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board in defining the risk framework within which the**

**business can operate. Audit forms the "third line of defense", independently and regularly reviewing Allianz SE's risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework. For the first and the second line of defense, Allianz SE has established dedicated responsibilities at its departments (including reinsurance).**

**(emphasis added).**

119.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors." The statement was also misleading as to the "third line of defense", audits, because Allianz's Internal Audit group conducted an audit of the Structured Product Group of AGI US, and even though "that audit identified red

– 47 –

flags that, if pursued, might have led to identification of at least certain aspects of the fraudulent scheme, no meaningful follow up was conducted." Therefore, the statement above was misleading.

120.   On August 26, 2019 AGI US filed a form ADV with the SEC. It included a "Part 2B Brochure Supplement" (the "2019 ADV Brochure") providing information about AGI US and its' personnel. In the section related to Tournant, it included an item regarding his supervision. It stated:

> AllianzGI US supervises and monitors the advice its portfolio managers provide to clients through regular reviews of client trading and positions for adherence to client investment guidelines and AllianzGI US's internal policies and procedures. The name and contact information for the person primarily responsible for supervising Mr. Tournant's investment advisory activities is Andreas Utermann, Member, Management Board of Allianz Global Investors GmbH and Global Chief Investment Officer for Allianz Global Investors

121.   The foregoing statement was misleading because, as AGI US admitted in pleading guilty to securities fraud, nobody at AGI US or Allianz, or any of its subsidiaries, supervised or monitored 1) client trading and positions to ensure adherence to client investment guidelines or 2) The AGI US Information the Structured Products Group provided to clients to ensure its accuracy.

122.   The 2019 ADV Brochure also stated the following with respect to Bond-Nelson's supervision:

> AllianzGI US supervises and monitors the advice its portfolio managers provide to clients through regular reviews of client trading and positions for adherence to client investment guidelines and AllianzGI US's internal policies and procedures. The name and contact information for the person primarily responsible for supervising Mr. Bond Nelson's investment advisory activities is Greg Tournant, Chief Investment Officer, US Structured Products

– 48 –

123.    The foregoing statement was misleading because, as AGI US admitted in pleading guilty to securities fraud, nobody at AGI US or Allianz, or any of its subsidiaries, supervised or monitored 1) client trading and positions to ensure adherence to client investment guidelines or 2) The AGI US Information the Structured Products Group provided to clients to ensure its accuracy.

124.    The 2019 ADV Brochure also stated the following with respect to Taylor's supervision:

> AllianzGI US supervises and monitors the advice its portfolio managers provide to clients through regular reviews of client trading and positions for adherence to client investment guidelines and AllianzGI US's internal policies and procedures. The name and contact information for the person primarily responsible for supervising Mr. Taylor's investment advisory activities is Greg Tournant, Chief Investment Officer, US Structured Products

125.    The foregoing statement was misleading because, as AGI US admitted in pleading guilty to securities fraud, nobody at AGI US or Allianz, or any of its subsidiaries, supervised or monitored 1) client trading and positions to ensure adherence to client investment guidelines or 2) The AGI US Information the Structured Products Group provided to clients to ensure its accuracy.

126.    On March 5, 2020, Allianz published the annual report for the Allianz Group for 2019 (the "2019 Group Annual Report"). The 2019 Group Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

**Overall risk organization and roles in risk management**

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. **These standards ensure the accurate and timely flow of risk-related information and a**

– 49 –

**disciplined approach towards decision-making and execution at both the global and the local level.**

**As a general principle, the responsibility for the "First Line of Defense" rests with business managers in the related undertaking. They are responsible for both the risks taken and the returns from their decisions. Our "Second Line of Defense" is made up of independent global oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board in defining the risk frameworks within which the business can operate. Group Audit forms the "Third Line of Defense", independently and regularly reviewing risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework.**

(emphasis added).

127.    The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US

control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors." The statement was also misleading as to the "third line of defense", audits, because Allianz's Internal Audit group conducted an audit of the Structured Product Group of AGI US, and even though "that audit identified red flags that, if pursued, might have led to identification of at least certain aspects of the fraudulent scheme, no meaningful follow up was conducted." Therefore, the statement above was misleading.

128.   The 2019 Group Report also stated:

Allianz SE has implemented a group-wide operational risk management framework that focuses on the early recognition and proactive management of material operational risks. The framework defines roles and responsibilities as well as management processes and methods. An important component of this framework is the Integrated Risk and Control System (IRCS), which ensures that effective controls or other risk mitigation activities are in place for all significant operational risks. Risk managers in the Allianz SE risk management function, in their capacity as the "second line of defense", identify and evaluate relevant operational risks and control weaknesses via a dialog with the "first line of defense", and in close interaction with both the other "second line of defense" functions at Allianz SE and with the audit function.

In the IRCS approach, risk identification, assessment and controls vary between the different operational risk sources reporting, compliance and operations. For example, compliance risks are addressed via written policies. The risk of financial misstatement is mitigated by a system of internal controls covering financial reporting.

129.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were

– 51 –

not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors."

130.   On March 5, 2020, the Company published its annual report for 2019 (the "2019 Annual Report"). The 2019 Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

**OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT**

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. **These standards ensure the accurate and timely flow of risk-related information and a disciplined approach towards decision-making and execution.**

**As a general principle, the "first line of defense" rests with business managers in the business units of Allianz SE (solo). They are responsible for both the risks taken and the returns from their decisions. Our "second line of defense" is made up of independent oversight functions including Risk, Actuarial, Compliance, and**

– 52 –

**Legal, which support the Board of Management in defining the risk framework within which the business can operate. Audit forms the "third line of defense", independently and regularly reviewing Allianz SE's risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework. For the first and the second line of defense, Allianz SE has established dedicated responsibilities at its departments (including reinsurance).**

131.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors." The statement was also misleading as to the "third line of defense", audits, because Allianz's Internal Audit group conducted an audit of the Structured Product Group of AGI US, and even though "that audit identified red

flags that, if pursued, might have led to identification of at least certain aspects of the fraudulent scheme, no meaningful follow up was conducted." Therefore, the statement above was misleading.

132.   On July 21, 2020, AGI US issued a statement on the AGI website titled "Structured Alpha March 2020 performance" (The "July 2020 Letter"). It stated, in pertinent part, that:

**Executive summary**

Since its inception in 2005, the funds in the AllianzGI Structured Alpha Portfolio (the "Portfolio") have offered investors access to structured products that seek to generate returns by harvesting premiums from liquid traded options, most significantly on the S&P 500.

The Portfolio includes funds that seek to achieve different levels of alpha to suit different risk-reward preferences of investors. Until their orderly liquidation at the end of March 2020, two funds sought to achieve 1000 basis points of alpha per annum, representing the funds with the greatest risk and greatest reward potential among the Portfolio's individual funds.

Allianz Global Investors ("AllianzGI") has conducted an analysis to better understand how the Portfolio's investment and risk management processes operated in the face of the market volatility sparked by the COVID-19 pandemic in February and March 2020, during which the Portfolio sustained substantial losses. Further analyses will focus on other factors that were not the focus of the current review, including the particular contribution of liquidity constraints.

**The review revealed that the Portfolio was at all times managed to its alpha targets and in accordance with its design, having in place protections and processes designed to offset certain of the risk inherent in earning alpha by selling options.**

133.   The foregoing statement was misleading for failing to disclose that the Structured Alpha Funds were not managed to their advertised alpha targets and were not managed in accordance with their design, and lacked failed to executes the

– 54 –

protections and processes designed to offset risks inherent in their strategy, in that the funds purchased deeper out of the money options than advertised.

134.   The July 2020 Letter also stated:

In the midst of the market downturn, the Portfolio Management team took active steps to reduce the Portfolio's risk, including by replacing then-existing positions with more conservative ones - a restructuring process implemented in past market downturns.

**Nonetheless, the speed, severity, and attendant increase in volatility of the March 2020 market decline led to losses - primarily concentrated in the Portfolio's core alpha-generating positions - and also prevented protective hedging positions from more substantially offsetting those losses.**

135.   The foregoing statement was misleading for failing to disclose that the Structured Alpha Funds' losses were due to their failure to adhere to their own promised hedging positions.

136.   The July 2020 Letter also stated:

While the losses suffered in the Portfolio are deeply disappointing, our analysis to date confirms that those losses were not the result of any failure in the Portfolio's investment strategy or risk management processes.

137.   The foregoing statement was misleading for failure to disclose that the losses were in fact the result of the failure to adhere to its stated investment strategy and employ promised risk management processes.

138.   The July 2020 Letter also stated:

**Introduction**

During the market volatility sparked by the COVID-19 pandemic in February and March 2020, funds within the Portfolio, and particularly those that were managed to higher alpha targets, realized substantial losses. For context, while these losses were large in dollar terms, they occurred during a month in which the S&P 500 dropped in value by

– 55 –

over $3 trillion. In the days and weeks following the losses, AllianzGI communicated with investors regarding its initial assessment of the market events and the resulting impact on the funds. In an effort to be fully transparent with investors, AllianzGI has subsequently conducted an analysis to better understand the sources of fund losses and to address several of the common questions posed by investors and their consultants. In order to continue to meet our selective disclosure obligations and to treat all investors fairly, we have prepared this summary, which we will make broadly available to prior and current investors including through posting on our website.

**The Portfolio's shareholders are primarily institutional investors, who typically invest on the advice of consultants following robust due diligence - a process which the consultants acknowledge provides them full insight into the strategy. The risks of investing in the Portfolio are fully disclosed, including the risk of total loss.** An investor's allocation to the Structured Alpha strategy will typically be made as a part of the investor's overall risk budget and appetite.

139.   The foregoing statement was misleading for failure to disclose that Structured Alpha Fund investors were not provided full insight into the strategy because AGI US employees tampered with and falsified reports provided to investors and their consultants. The foregoing statement was also misleading because as a result of that tampering, the risks of investing were not fully disclosed.

140.   The July 2020 Letter also stated:

AllianzGI's review revealed that even during the most turbulent days of this period, **the Portfolio was at all times managed to its alpha targets and in accordance with its design, and as disclosed to and evaluated by our investors and their consultants.**

141.   The foregoing statement was misleading for failing to disclose that the Structured Alpha Funds were not managed to its targets or according to its design, and were not managed as disclosed to its investors and their consultants.

142.   The July 2020 Letter also stated:

– 56 –

The Portfolio losses were the direct result of the speed, duration and severity of the market decline and attendant increase in volatility, which overtook the Portfolio Management team's portfolio restructuring process. **This restructuring process, which has been a cornerstone of the Structured Alpha products' investment strategy since its inception in 2005, operated as described to investors and was implemented during this period as it was in past market downturns.**

143.   The foregoing statement was misleading for failing to disclose that the Structured Alpha Funds' strategy did not operate as described to investors.

144.   The July 2020 Letter also stated:

**Portfolio design and construction**

Since the inception of the Structured Alpha strategy, the Portfolio has held options positions grouped into three core strategies: (i) Range-Bound Spreads; (ii) Directional Spreads; and (iii) Hedging Positions. The Range-Bound Spreads, which are designed to generate returns in normal markets, have contributed approximately two-thirds of the Portfolio's alpha since its inception. The Directional Spreads, which are designed to generate incremental gains during less typical market conditions, have historically contributed approximately one-third of the Portfolio's alpha. The Hedging Positions, which are designed to offer a level of protection in the event of a short-term market crash, have reduced the Portfolio's alpha, as the cost to implement them is rarely recovered. Nonetheless, the Hedging Positions play an important role in providing protection to the Portfolio against a sudden volatility increase and market shock. In the case of less dramatic market movements, the Portfolio's risk profile is primarily adjusted through the restructuring of the Range-Bound Spreads and Directional Spreads. The Portfolio Management team restructures by closing out of and then re-establishing the options in the Range-Bound Spreads and Directional Spreads at new strike prices as the S&P 500 and other indices change.

145.   The foregoing statement was misleading because AGI US failed to follow the advertised strategy, purchased deeper out of the money options than advertised, and sought a higher alpha target than advertised.

146.   The July 2020 Letter also stated:

**Throughout February and into March 2020, the Portfolio maintained all three core strategies described above using options struck on the S&P 500 index.** The Portfolio also maintains one or more of the strategies in the VIX index, VXX exchange-traded notes, the Nasdaq 100 index, and Russell 2000 index. **Consistent with its obligations to investors to pursue returns in accordance with the funds' respective alpha-seeking mandates, the Portfolio continued to be managed in accordance with its design (rather than being converted to cash) as markets declined in the first half of March.** As market stress increased, the risk exposure of the Portfolio was reduced by the systematic restructuring of options positions.

147.   The foregoing statement was misleading for failing to disclose that the Structured Alpha Funds' strategies were not maintained as promised, was not managed consistent with its obligations, and that the Funds' losses were due to their failure to adhere to the promised strategy.

148.   The July 2020 Letter also stated:

**Risk management**

**AllianzGI's approach to risk management utilizes three lines of defense, with the first line of defense managed by business functions (including the Portfolio Management teams), the second line of defense provided by AllianzGI's independent Enterprise Risk Management and Compliance teams (organizationally separate from revenue generating business functions) and the third line of defense provided by the Internal Audit function of Allianz Asset Management ("AllianzAM," a part of Allianz Group).**

149.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha

– 58 –

Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors."

150.    The July 2020 Letter also stated:

Regarding the Structured Alpha Portfolio, the first line of defense is primarily provided by the Portfolio Management team. The Portfolio strives to generate excess returns (or alpha) primarily by selling out-of-the-money options on various indices. By using proprietary statistical analysis to select strike prices based on analysis of historical market movements, the portfolio managers endeavor to earn excess returns to achieve the Portfolio's alpha targets while managing risk. In selectively exposing the Portfolio to the short option positions, the Portfolio acts like an insurer, taking on measured risk in exchange for the receipt of premiums. Due to the nature of these positions, there remains at all times a possibility that market movements cause certain written options to increase in value, to the economic detriment of the Portfolio.

**AllianzGI has at all times, including during February and March 2020, had in place risk mitigation approaches to offset a portion of losses or mitigate the risk inherent in earning alpha by selling options. In** addition to a range of analytics that the Portfolio Management team employs in assessing the Portfolio's risk exposure, portfolio risk is mitigated by two approaches: (i) the Hedging Positions

– 59 –

Case 2:23-cv-00719-DSF-MAA   Document 43   Filed 10/06/23   Page 60 of 91   Page ID #:355

mentioned above (e.g., deep out-of-the-money S&P 500 long puts); and (ii) the restructuring of the Range-Bound Spreads and Directional Spreads and other positions.

151.   The foregoing statement was misleading for failing to disclose that the Structured Alpha Funds failed to adhere to their advertised hedging strategy.

152.   The July 2020 Letter also stated:

The Hedging Positions are designed to offer some protection in the case of a very short-term market crash. These positions are not intended to provide broader protection against all market downturns, particularly downturns that transpire over longer periods of time, and therefore would not offset substantially the losses from the Range-Bound Spread positions.

The risks posed by market downturns such as February-March 2020 are primarily addressed by the restructuring of options positions. Restructuring is a process of risk mitigation by which the Portfolio Management team adjusts the Portfolio to market moves by closing out a portion of the options that serve as the Portfolio's core alpha generators and replacing them with new positions with strike prices further out of the money, for example. Over the years, restructuring has served as a vital component of the Portfolio Management team's risk mitigation process, **allowing the Portfolio to dynamically manage risk while still pursuing its funds' respective stated alpha targets** - a process that has been explained at length to all investors. The Portfolio Management team implemented these procedures and intervened on short puts in advance of their typical default restructuring protocols due to the severity of the market declines. In addition, commencing on March 12, 2020, the Portfolio Management team stopped relayering new short puts on the SPX and NDX, and short calls on the VIX and VXX to further reduce the risks in the portfolio.

153.   The foregoing statement was misleading because the Structured Alpha Funds failed to adhere to their stated hedging strategy.

154.   The July 2020 Letter also stated:

– 60 –

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Within the second line of defense, AllianzGI's independent Enterprise Risk Management function operates a risk management framework across all risk types, including portfolio risk, as well as operational, business, counterparty and other risks. With respect to portfolio risk, the Enterprise Risk Management function seeks to define, with input from the Portfolio Management team, a risk level that is informed by various considerations. In defining a risk appetite, it is acknowledged that not all risk can be removed subject to the risk-reward profile of a particular strategy. The Enterprise Risk Management function performs a series of quantitative portfolio risk tests independent of the Portfolio Management team's own models and analysis. These tests focus on predictive indicators that assess how the Portfolio is positioned for defined, single-day stresses, which are based on historically-viewed worst case scenarios. The tests confirm the Portfolio's robustness against such scenarios, confirm that the long-put hedging positions are in place, and establish an escalation threshold for follow-up interactions with the Portfolio Management team where needed. In addition to stress tests, other portfolio metrics are analyzed including liquidity (for U.S. registered mutual funds in particular) and Value at Risk. **These controls and reports are generated at least daily and operated, as defined, throughout the market volatility experienced in March 2020.**

155.   The foregoing statement was misleading for failing to disclose that the reports generated by the Enterprise Risk Management Function were altered by AGI US Employees. Nor did it operate as designed.

156.   The July 2020 Letter also stated:

At the third line of defense level, we can confirm that both the Structured Products Portfolio Management team and the Enterprise Risk Management team have been subject to AllianzAM Internal Audit reviews that were in part focused on portfolio risk within the standard audit cycle. These audits resulted in no material findings.

157.   The foregoing statement was misleading for failing to disclose that an internal audit was performed in 2017 that showed red flags, but Allianz failed to perform an adequate follow up that if completed would have uncovered the fraud.

– 61 –

158.    The July 2020 Letter also stated:

**Conclusion**

While the losses suffered within the Structured Alpha Portfolio are of course deeply disappointing, our analysis to date of the Portfolio's March 2020 performance confirms that **those losses were not the result of any failure in the Portfolio's investment strategy or risk management processes.** Rather, AllianzGI's normal portfolio restructuring was overtaken by the combined market decline and volatility increase. Further analyses will focus on other factors that were not the focus of the current review, including the particular contribution of liquidity constraints.

159.    The foregoing statement was misleading for failing to disclose that the Structured Alpha Funds' losses were due to the failure to adhere to their investment strategies, internal audit and risk management processes.

160.    On March 5, 2021, Allianz published the annual report for the Allianz Group for 2020 (the "2020 Group Annual Report"). The 2020 Group Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

**OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT**

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. **These standards ensure the accurate and timely flow of risk-related information and a disciplined approach towards decision-making and execution. As a general principle, the responsibility for the "First Line of Defense" rests with business managers in the business units of Allianz SE. They are responsible for both the risks taken and the returns from their decisions. Our "Second Line of Defense" is made up of independent oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board of Management in defining the risk framework within which the business can**

– 62 –

**operate. Audit forms the "Third Line of Defense", independently and regularly reviewing Allianz SE's risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework. Allianz SE has established dedicated responsibilities for the three lines of defense at its departments (including reinsurance).**

(emphasis added).

161.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors." The statement was also misleading as to the "third line of defense", audits, because Allianz's Internal Audit group conducted an audit of the Structured Product Group of AGI US, and even though "that audit identified red

flags that, if pursued, might have led to identification of at least certain aspects of the fraudulent scheme, no meaningful follow up was conducted." Therefore, the statement above was misleading.

162. The 2020 Group Report also stated:

Allianz has developed a consistent operational risk management framework, which is applied across the Group based on proportionality and focuses on the early recognition and proactive management of material operational risks. The framework defines roles and responsibilities as well as management processes and methods: Local risk managers, in their capacity as Second Line of Defense, identify and evaluate relevant operational risks and control deficiencies via a dialog with the First Line of Defense, report operational risk events in a central database, and ensure that the framework is implemented in their respective operating entity.

This framework triggers specific mitigating control programs. For example, compliance risks are addressed with written policies and dedicated compliance programs monitored by the Group Compliance function at Allianz Group. The risk of financial misstatement is mitigated by a system of internal controls covering financial reporting.

163. The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because

– 64 –

"neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors."

164.   On March 5, 2021, the Company published its annual report for 2020 (the "2020 Annual Report"). The 2020 Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

### OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT

A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. **These standards ensure the accurate and timely flow of risk-related information and a disciplined approach towards decision-making and execution.**

**As a general principle, the responsibility for the "First Line of Defense" rests with business managers in the business units of Allianz SE. They are responsible for both the risks taken and the returns from their decisions. Our "Second Line of Defense" is made up of independent oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board of Management in defining the risk frame-work within which the business can operate. Audit forms the "Third Line of Defense", independently and regularly reviewing Allianz SE's risk governance implementation, compliance with risk principles, per-forming quality reviews of risk processes, and testing adherence to business standards, including the internal control framework. Allianz SE has established dedicated responsibilities for the three lines of defense at its departments (including reinsurance).**

– 65 –

165.   The foregoing statement was misleading for failing to disclose that, as AGI US admitted when it pled guilty to securities fraud, as to the Structured Alpha Funds, "there were significant gaps and weaknesses in AGI US's controls as they related to the Funds" and that "the control functions at AGI US, the defendant, were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told." The statement was misleading because "no one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised" and "client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance." The statement was also misleading because "neither [enterprise risk management] nor any other independent function was tasked with monitoring whether AGI US … was adhering to its representations to investors in the management of the Funds." Further, "in part because of AGI US control failures, and despite these representations, Tournant and Bond-Nelson were able to corrupt the independence of the IDS risk reports by altering them before they were sent to investors."

## LOSS CAUSATION

166.   Defendants' misstatements caused investors losses, which occurred through a series of materializations of risks concealed by the fraud and partial corrective disclosures. As Allianz CFO Giulio Terzariol admitted on a November 11, 2022 earnings call, in discussing Allianz's performance, "first of all, we need to say that clearly, the Structured Alpha situation had some impact on our share price."

167.   On August 1, 2021, Allianz issued an investor release titled Allianz SE: Reassessment of risks relating to Structured Alpha Funds. it stated:

– 66 –

Subsequent to the litigation pending in U.S. courts in relation to the Structured Alpha Funds against Allianz Global Investors U.S. LLC and other Allianz Group companies and the investigation launched by the U.S. Securities and Exchange Commission ("SEC") in 2020, the U.S. Department of Justice ("DOJ") has begun an investigation concerning the Structured Alpha Funds, and Allianz Global Investors U.S. LLC has received a voluntary request for documents and information from the DOJ. Allianz is fully cooperating with the SEC and the DOJ in the investigations and has immediately started its own review of this matter.

In light of the DOJ investigation and based on information available to Allianz as of today, the Board of Management of Allianz SE has reassessed the matter and has come to the conclusion that there is a relevant risk that the matters relating to the Structured Alpha Funds could materially impact future financial results of Allianz Group. However, it is currently neither feasible to predict how the SEC and DOJ investigations and the pending court proceedings may be resolved nor the timing of any such resolution. It is in particular not feasible to reliably estimate the amount of any possible resolution including potential fines. Therefore, no provision has been recognized at the current stage.

168.   On this news, Allianz ADRs declined 8.75% on August 2, 2021, or $2.00, to a closing price of $22.85. This decline was a result of the partial materialization of the risks concealed by Defendants' misconduct.

169.   On February 17, 2022, during market hours, Allianz announced that it had booked a provision with regards to "the pending court and governmental proceedings in the U.S. in relation to the Structured Alpha Funds," and provided the following, in pertinent part:

**Provision with respect to AllianzGI US Structured Alpha Funds; new share buy-back of up to EUR 1 billion**

*Allianz to book a provision with respect to risks relating to the AllianzGI US Structured Alpha Funds in the financial statements 2021; Allianz resolves on new share buy-back of up to EUR 1 billion*

– 67 –

With respect to the pending court and governmental proceedings in the U.S. in relation to the Structured Alpha Funds, Allianz anticipates settlements with major investors in those Funds shortly. ***In anticipation thereof and in light of current discussions with U.S. governmental authorities, Allianz today decided to book a provision of 3.7 billion euros in the financial statements 2021. This provision reduced the 2021 Group net income by 2.8 billion euros.***

(Emphasis added.)

170.   On this news, the Company's ADR price fell $2.04 per share, or 8.1% over the following two trading days, to close at $23.27 per share on February 22, , damaging investors.

171.   On March 4, 2022, the Company published its annual report for 2021 (the "2021 Annual Report"). The 2021 Annual Report stated the following, in pertinent part, regarding (and generally touting) its internal controls and compliance:

> ***Internal controls are embedded in the accounting processes to safeguard the accuracy, completeness, and consistency of The AGI US Information provided in our financial statements.***
>
> \*     \*     \*
>
> **Corporate governance practices**
>
> **Internal control system**
>
> ***The Allianz Group has an effective internal risk and control system for verifying and monitoring its operating activities and business processes, in particular financial reporting, as well as compliance with regulatory requirements.*** The requirements placed on the internal control system are essential, not only for the resilience and franchise value of the company, but also to maintain the confidence of the capital market, our customers, and the public. An assessment of the adequacy and effectiveness of the internal control system as part of the System of Governance is conducted regularly in the course of the review of the

– 68 –

business organization. For further information on our risk organization and risk principles, please refer to the section "Risk governance system" in the Risk and Opportunity Report. For further information on our Integrated Risk and Control System for Financial Reporting, please refer to the respective chapter.

In addition, *the quality of our internal control system is assessed by the Allianz Group's Internal Audit function*. *This function conducts independent, objective assurance activities, analyzing the structure and efficiency of the internal control system as a whole.* In addition, it also examines the potential for additional value and improvement of our organization's operations. *Fully compliant with all international auditing principles and standards, Internal Audit contributes to the evaluation and improvement of the effectiveness of the risk management, control, and governance processes.* Therefore, internal audit activities are geared towards helping the company to mitigate risks, and further assist in strengthening its governance processes and structures.

**Compliance management system**

*Integrity is at the core of our compliance programs and the basis for the trust of our customers, shareholders, business partners, and employees.* The Compliance function fosters a corporate culture of individual and collective responsibility for ethical conduct and adherence to the rules by:

− advising the Board of Management, managers, and employees on business conduct that is lawful and ethical;
− identifying and assessing material compliance risks and overseeing the implementation of adequate and effective internal controls to mitigate them;
− providing a speak-up facility that employees and third parties can use to confidentially report possible illegal or inappropriate behavior;
− communicating transparently and trustfully with supervisory authorities.
The global compliance programs coordinated by Allianz SE's central Group Compliance function support our employees, managers, and

executive board members to act responsibly and with integrity in all situations.

***Moreover, Allianz SE's central Group Compliance function is responsible – in close cooperation with local compliance functions – for ensuring the effective implementation and monitoring of the compliance programs within the Allianz Group as well as for investigating potential compliance infringements.*** Furthermore, as a key function, the Compliance function carries out the advisory, risk identification and assessment, monitoring, and early warning tasks required under the Solvency II regime.

(Emphasis added.)

172.   The 2021 Annual Report did not reveal the severe underlying issues but instead stated the following, in pertinent part, regarding the Company's and its subsidiaries' relevant legal and regulatory issues:

**Litigation**

***Allianz SE is involved in legal, regulatory, and arbitration proceedings in Germany and foreign jurisdictions, including the United States. Such proceedings arise in the ordinary course of business, including, amongst others, Allianz SE's activities as a reinsurance company, employer, investor and taxpayer.*** While it is not feasible to predict or determine the ultimate outcome of such proceedings, they may result in substantial damages or other payments or penalties, or result in adverse publicity or damage to Allianz SE's reputation. As a result, such proceedings could have an adverse effect on Allianz SE's business, financial condition, and results of operations. Apart from the proceedings discussed below, Allianz SE is not aware of any threatened or pending legal, regulatory or arbitration proceedings which may have, or have had in the recent past, significant effects on its financial position or profitability. Material proceedings in which Allianz SE is involved are in particular the following:

Since July 2020, multiple complaints have been filed in U.S. Federal Courts and also in certain U.S. State Courts against Allianz Global

Investors U.S. LLC (AllianzGI U.S.) and in certain complaints, against certain of AllianzGI U.S.'s affiliates, including Allianz SE and Allianz Asset Management GmbH ("Affiliate Allianz Defendants"), in connection with losses suffered by investors in AllianzGI U.S.'s Structured Alpha funds (Funds) during the COVID-19 related market downturn. The actions brought to date have included institutional investor plaintiffs and individual plaintiffs, with certain plaintiffs asserting claims on behalf of putative classes. An investment consultant has also asserted third-party claims against AllianzGI U.S.. Plaintiffs in the currently pending 26 actions have alleged losses of approximately USD 6.3 bn. In addition to the complaints filed to date, other investors in the Funds, or other third parties, may bring similar actions. ***Plaintiffs in these actions have dismissed without prejudice all claims against Affiliate Allianz Defendants, including Allianz SE and Allianz Asset Management GmbH, with only one exception where Allianz Global Investors Distributors LLC is kept as a defendant next to AllianzGI U.S. AllianzGI U.S. continues to defend against the allegations contained in the complaints.***

***Upon request from the U.S. Securities and Exchange Commission (SEC), AllianzGI U.S. has provided substantial information to the SEC in connection with an SEC investigation of the Funds, and Allianz is fully cooperating with the SEC's ongoing investigation.***

***In addition, the U.S. Department of Justice (DOJ) is continuing its investigation concerning the Funds, and AllianzGI U.S. is also fully cooperating with the DOJ in the investigation and is continuing its own review of the matter.***

On 1 August 2021, in light of the DOJ investigation and based on information then available to Allianz, the Board of Management of Allianz SE reassessed the Structured Alpha matter and came to the conclusion, as also announced by ad-hoc disclosure, that there is a relevant risk that the matters relating to the Funds could materially impact future financial results of Allianz Group.

***In light of the discussions with plaintiffs and U.S. Governmental Authorities concerning the Structured Alpha matter and in anticipation of settlements with major investors in the Funds, Allianz***

– 71 –

***decided, as announced by ad-hoc disclosure on 17 February 2022, to recognize a provision of € 3.7 bn for the fourth quarter of 2021 within the Asset Management segment of the Allianz Group financial statements.*** The provision reflects the elements of the expected obligation in the Structured Alpha matter, for which, as of today, a reliable estimate could be determined. Final settlements with major investors were reached shortly thereafter and Allianz believes that these settlements represent a substantial majority of the Structured Alpha civil litigation exposure.

Discussions with remaining plaintiffs, the DOJ as well as the SEC are ongoing, and the timing and nature of any global or coordinated resolution of these matters is not certain. Therefore, as of today, the total financial impact of the Structured Alpha matter cannot be reliably estimated and it is expected that additional expenses will be incurred before these matters are finally resolved. Such additional expenses also cannot reliably be estimated and consequently are not included in the provision recognized in the Allianz Group financial statements. For Allianz SE the Structured Alpha matter has not led to any requirement for building a provision.

(Emphasis added.)

173.   On this news, the Company's ADR price fell $0.93 per share, or 4.5%, to close at $19.67 per share on March 7, 2022, the next trading day, damaging investors.

174.   On May 12, 2022, before market open, Allianz announced its first quarter 2022 results. It stated: "Net income attributable to shareholders 0.6 billion euros, down 78.1 percent following an additional after-tax provision of 1.6 billion euros related to the AllianzGI U.S. Structured Alpha proceedings. Excluding the provision, net income was 2.2 billion euros, down 16.0 percent mainly due to a lower non-operating result."

175.   Terzariol acknowledged the significance of this news on Allianz's performance in a conference call that same day, remarking that "[w]hen we look at

– 72 –

the net income, clearly here, we had a charge of EUR 1.6 billion because of Structured Alpha. If you adjust the numbers for the Structured Alpha charge, we are back to a level of, I think EUR 2.2 billion, which is basically in line with what we would generally expect." Summarizing the quarterly results, he stated that Allianz had "good underlying performance, clearly hit coming from the Structured Alpha situation."

176.   On this news, the Company's ADR price fell $0.65 per share, or 3.07%, to close at $20.80 per share on May 12, 2022, damaging investors.

177.   On May 17, 2022, during market hours, the SEC issued a press release entitled "SEC Charges Allianz Global Investors and Three Former Senior Portfolio Managers with Multibillion Dollar Securities Fraud" which further provided the following regarding the fraudulent scheme in pertinent part:

> **The Securities and Exchange Commission (SEC) today charged Allianz Global Investors U.S. LLC (AGI US) and three former senior portfolio managers with a massive fraudulent scheme that concealed the immense downside risks of a complex options trading strategy they called "Structured Alpha."** AGI US marketed and sold the strategy to approximately 114 institutional investors, including pension funds for teachers, clergy, bus drivers, engineers, and other individuals. After the COVID-19 market crash of March 2020 exposed the fraudulent scheme, the strategy lost billions of dollars as a result of AGI US and the portfolio managers' misconduct. **AGI US has agreed to pay billions of dollars as part of an integrated, global resolution, including more than $1 billion to settle SEC charges and together with its parent, Allianz SE, over $5 billion in restitution to victims.**
>
> "**Allianz Global Investors admitted to defrauding investors over multiple years, concealing losses and downside risks of a complex strategy, and failing to implement key risk controls**," said SEC Chair Gary Gensler. …
>
> The SEC's complaint, filed in the federal district court in Manhattan, alleges that **Structured Alpha's Lead Portfolio Manager, Gregoire P.**

– 73 –

*Tournant, orchestrated the multi-year scheme to mislead investors who invested approximately $11 billion in Structured Alpha, and paid the defendants over $550 million in fees*. It further alleges that, *with assistance from Co-Lead Portfolio Manager, Trevor L. Taylor, and Portfolio Manager, Stephen G. Bond-Nelson, Tournant manipulated numerous financial reports and other information provided to investors to conceal the magnitude of Structured Alpha's true risk and the funds' actual performance.*

*Defendants reduced losses under a market crash scenario in one risk report sent to investors from negative 42.1505489755747% to negative 4.1505489755747% -- by simply dropping the single digit 2. In another example, defendants "smoothed" performance data sent to investors by reducing losses on one day from negative 18.2607085709004% to negative 9.2607085709004% -- this time by cutting the number 18 in half.*

*When the 2020 COVID-related market volatility revealed that AGI US and the defendants had misled investors about the fund's level of risk, the fund suffered catastrophic losses and investors lost billions; the defendants all the while profited from their deception.* The complaint further alleges that *Tournant, Taylor, and Bond-Nelson then made multiple, ultimately unsuccessful, efforts to conceal their misconduct from the SEC*, including false testimony and meetings in vacant construction sites to discuss sending their assets overseas.

"*From at least January 2016 through March 2020, the defendants lied about nearly every aspect of a highly complex investment strategy they marketed* to institutional investors, including pension funds managing the retirement savings of everyday Americans. *While they were able to solicit over $11 billion in investments by the end of 2019 and earn over $550 million in fees as a result of their lies, they lost over $5 billion in investor funds when the market volatility of March 2020 exposed the true risk of their products*," said Gurbir S. Grewal, Director of the SEC's Division of Enforcement. "*Following the crash of the Structured Alpha Funds, the defendants continued their pattern of deceit by lying to SEC staff and their fraud would have gone undetected if it weren't for the persistence of SEC lawyers who pieced together the full scope of the massive fraud*."

— 74 —

***AGI US admitted that its conduct violated the federal securities laws*** and agreed to a cease-and-desist order, a censure and payment of $315.2 million in disgorgement, $34 million in prejudgment interest, and a $675 million civil penalty, a portion of which will be distributed to certain investors, with the amount of disgorgement and prejudgment interest deemed satisfied by amounts it paid to the U.S. Department of Justice as part of an integrated, global resolution. In a parallel criminal proceeding, the U.S. Attorney's Office for the Southern District of New York today announced criminal charges for similar conduct against AGI US, Tournant, Taylor, and Bond-Nelson.  As part of the parallel criminal proceeding, AGI US, Taylor and Bond-Nelson have agreed to guilty pleas.

(Emphasis added.)

178.   That same day, May 17, 2022, the U.S. Department of Justice ("DOJ") issued a press release entitled "Three Portfolio Managers And Allianz Global Investors U.S. Charged In Connection With Multi-Billion Dollar Fraud Scheme" which further provided the following regarding the fraudulent scheme, in pertinent part:

Damian Williams, the United States Attorney for the Southern District of New York, Lisa O. Monaco, the Deputy Attorney General of the United States, and Daniel B. Brubaker, Inspector-in-Charge of the New York Office of the U.S. Postal Inspection Service ("USPIS"), announced today the unsealing of an indictment charging GREGOIRE TOURNANT, the Chief Investment Officer and co-lead Portfolio Manager for a series of private investment funds managed by Allianz Global Investors U.S. LLC ("AGI"), with conspiracy, securities fraud, investment adviser fraud, and obstruction of justice offenses in connection with a scheme to defraud investors. Those funds ultimately collapsed, leading to billions of dollars of investor losses. TOURNANT surrendered to Postal Inspectors in Denver, Colorado this morning and is expected to be presented later today.  The case has been assigned to U.S [sic] District Judge Laura Taylor Swain.

– 75 –

Also unsealed today are the guilty pleas of TREVOR TAYLOR and STEPHEN BOND-NELSON in connection with their respective roles in the scheme. TAYLOR pled guilty pursuant to an Information before U.S. District Judge Denise Cote on March 8, 2022. BOND-NELSON pled guilty pursuant to an Information before U.S. District Judge Paul A. Engelmayer on March 3, 2022. Both are cooperating with the Government.

**U.S. Attorney Williams, Deputy Attorney General Monaco, and Inspector-in-Charge Brubaker also announced today a plea agreement (the "Agreement") pursuant to which AGI will plead guilty to securities fraud in connection with this fraudulent scheme, and pay more than $3 billion in restitution to the innocent victims of this fraud, pay a criminal fine of approximately $2.3 billion, and forfeit approximately $463 million to the Government.** The case has been assigned to U.S. District Judge Colleen McMahon. A conference has been scheduled for today at 3:00 p.m. before U.S. District Judge Loretta A. Preska, Part I, at which time **AGI is expected to plead guilty** to an Information pursuant to the Agreement.

U.S. Attorney Damian Williams said: "**As alleged, Gregoire Tournant and his co-conspirators lied to investors and secretly exposed them to substantial risk in order to line their own pockets and those of their employer, AGI.** Pension funds for so many retirees, religious organizations, and essential workers – from laborers in Alaska, to teachers in Arkansas, to bus drivers and subway conductors here in New York City – **invested with AGI because they were promised a relatively safe investment with strict risk controls**. **But AGI, the "master cop" that Tournant claimed was watching over his shoulder, making sure that he adhered to his promises, was asleep on the beat.** And when the storm came in March 2020, when the COVID crash hit, these investors got soaked and lost billions. Today's actions are further evidence that this office is not asleep on the beat and that with our law enforcement partners we will act swiftly to protect investors and bring white collar criminals to justice."

Deputy Attorney General Lisa O. Monaco said: "I previously warned that the Department of Justice would crack down on corporate crime, without regard to size, salary, or other privilege. For the second time in

– 76 –

under a month, the Department has brought charges in connection with a sophisticated Wall Street scheme that cost victims billions of dollars. Other corporations should take note that *the results here are driven in part by the fact that this company failed to self-report their crimes*. The Department stands ready to keep bringing these kinds of charges to assure the public that no one is above the law." …

According to the allegations in the Indictment and the Agreement unsealed today in Manhattan federal court: [footnote omitted]

Between 2014 and 2020, GREGOIRE TOURNANT, the defendant, was the Chief Investment Officer of a set of private funds at AGI known as the Structured Alpha Funds.  These funds were marketed largely to institutional investors, including pension funds for workers all across America.  As alleged, TOURNANT and his co-conspirators misled these investors into believing that the funds were protected from a sudden stock market crash with particular hedges.  *But in late 2015, as the cost of those promised hedges increased, TOURNANT decided to lie and secretly buy cheaper hedges that provided much less protection to investors.   As alleged, TOURNANT and his co-conspirators also provided investors with altered documents that were sent to investors to hide the true riskiness of the funds' investments, including that they were buying cheaper hedges.*

*In March 2020, following the onset of market dislocations brought on by the COVID-19 pandemic, the funds lost in excess of $7 billion in market value, including over $3.2 billion in principal, faced margin calls and redemption requests, and ultimately were shut down.*  …

*The scheme alleged was an egregious, long-running, and extensive fraud that went undetected for years.  It occurred at a very profitable component of AGI – one that accounted for 25% of AGI's revenue in recent years, which amounted to hundreds of millions of dollars.*  As alleged, one of the ways TOURNANT carried out the fraud was by marketing the fact that he worked for a well-respected financial institution, AGI, which is a part of the Allianz SE ("Allianz") family. Allianz is one of the world's largest financial services companies and one of the world's largest insurance companies.  *TOURNANT touted the protections provided by the funds' position within the global*

– 77 –

*Allianz corporate structure, calling Allianz a "master cop" that would ensure that TOURNANT followed the risk guidelines promised to investors.*

*Despite TOURNANT's claim that Allianz acted as a "master cop" looking over his shoulder, no one at AGI or Allianz was verifying that TOURNANT and his colleagues were actually adhering to the investment strategies promised to investors.  No risk or compliance personnel at AGI verified, attempted to verify, or were responsible for verifying that TOURNANT and his colleagues were purchasing hedging positions within the range that was represented to investors. Much of this historic fraud was made possible because AGI's control environment was not designed to verify that TOURNANT and his co-conspirators were telling investors the truth.* Because AGI, a registered investment adviser, failed to provide meaningful oversight, TOURNANT and his co-conspirators were able to deceive investors about the risks they were taking with their money.

*In addition, as alleged, in the summer of 2020, after the onset of the pandemic and in order to cover up the fraudulent scheme, TOURNANT attempted to obstruct an investigation by the U.S. Securities and Exchange Commission (the "SEC") into the circumstances that led to the losses in March 2020.*

(Emphasis added.)

179.    Summarizing the charges, guilty pleas, and settlements, *The Wall Street Journal* published an article on May 17, 2022 entitled "Allianz Subsidiary Pleads Guilty to Defrauding Investors as Part of $6 Billion Settlement" which further provided the following in relevant part:

*One of Allianz SE's [] U.S. investing divisions pleaded guilty to securities fraud and agreed to pay about $6 billion in penalties and restitution* to investors who suffered losses when some of the subsidiary's hedge funds tanked during the March 2020 market selloff.

*Allianz Global Investors U.S. admitted Tuesday that it lacked internal controls and oversight for a series of private-investment funds and*

— 78 —

*made false and misleading statements to investors*, according to a plea agreement reached with the Manhattan U.S. attorney's office. The U.S. subsidiary also settled civil-fraud claims brought by the Securities and Exchange Commission.

The $6 billion will resolve the government's criminal and civil claims, as well as those from defrauded investors. ***The agreement is among the largest criminal resolutions between a financial institution and the Justice Department in recent years.***

\*   \*   \*

The case centered on Allianz Global Investors' Structured Alpha funds, which bet heavily on stock options that effectively sold insurance to other investors that were hedging against a potential market selloff. The strategy had been profitable during the market's calm stretch, and ***Allianz managers had assured investors that they had hedged their own trades in the event that the markets turned volatile.***

\*   \*   \*

***The Structured Alpha funds lost more than $7 billion in March 2020, according to the government. On March 25 of that year, Allianz informed investors that two of its funds would be liquidated.***

\*   \*   \*

***Allianz said its guilty plea would disqualify Allianz Global Investors from advising U.S. mutual funds and certain pensions.*** The firm said it expects the SEC to issue waivers on Tuesday that would ensure the agreement wouldn't affect Allianz Life or its other U.S. money manager, Pacific Investment Management Co.

\*   \*   \*

***Prosecutors said the Allianz scheme lasted from at least 2014 to March 2020 with Mr. Tournant reaping more than $60 million in compensation during that time.*** He and his team misled investors over the risks the funds were taking and how they were producing their

– 79 –

returns, prosecutors alleged. The Structured Alpha managers also misrepresented the hedging strategies they had used to protect the funds' assets, prosecutors said.

The government also alleged that Mr. Tournant sought to obstruct the SEC inquiry into the losses by directing Mr. Bond-Nelson to lie to the regulator.

\*       \*       \*

The men also misstated daily performance results sent to some investors, making returns look better than they were, the SEC said.

(Emphasis added.)

180.   On this news, the Company's ADR price fell $0.57 per share, or 2.6%, to close at $20.80 per share on May 18, 2022, the next full trading day, damaging investors.

181.   As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER

182.   AGI US's scienter can be established through its guilty plea. AGI US admitted, in pleading guilty to violating 17 CFR 340.10b-5 of the regulations implementing Section 10(b) of the Securities Exchange Act, that AGI US employees who engaged in fraudulent conduct  "intended that this conduct, at least in part, would benefit AGI US, as the misrepresentations were designed to induce investors to invest, or maintain their investments, in the Structured Alpha Funds." AGI US also admitted that "[t]he portfolio managers acted within their authority and scope of employment with respect to these matters, whose performance was generally entrusted to them by AGI US." AGI US further admitted that it "overstated the level

– 80 –

of independent risk oversight over the Structured Alpha Funds and failed to disclose relevant risk information."

183.    Through the doctrine of *respondeat superior*, the scienter of AGI US can be attributed to Allianz. Allianz SE's Board of Management is charged with "setting business objectives and the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system, including "risk controlling processes" set by the Board that required "regular reporting to [Allianz] Group"" Board members of both Allianz SE and executives of Allianz subsidiaries sat on a "Group Investment Committee" responsible for "implementing the Group investment strategy, including monitoring group-wide investment activities" and "approving investment-related frameworks and guidelines[.]" According to those filings, Allianz Group runs its "operating entities"-including the Defendant subsidiaries here that comprise its asset management division-"via an integrated management and control process," which includes Allianz Group reviewing the operating entities' "business strategies and goals."

184.    Further supporting Allianz's scienter is the fact that both the Internal Audit and Enterprise Risk Management functions charged with overseeing AGI US and the Structured Alpha Funds in particular reported directly to Allianz's board of management, and both identified red flags that the board of managers of Allianz knew, or were reckless for not knowing, meant that AGI US was deviating from its strategy and taking unacceptably risky bets. Allianz SE tasked IDS with carrying out the Enterprise Risk Management function, in part by generating daily risk reports that revealed that the Structured Alpha Funds were taking riskier than promised bets. While Tournant altered those reports before sending them to investors in the Structured Alpha Funds, IDS, and therefore Allianz's board of managers, had the

– 81 –

true numbers, which revealed AGI US's fraud. Further, because Allianz SE assigned this task to IDS, IDS was the agent of Allianz SE and its knowledge can be imputed to Allianz. In addition, Allianz's internal audit, carried out by AllianzAM, found red flags that it failed to act upon, which would have uncovered the fraud. Because AllianzAM also directly reported to the board of management, Allianz was at least reckless for not acting on the red flags in the audit. In addition, because Allianz SE tasked AllianzAM with performing the internal audit function on AGI US for Allianz SE, AllianzAM was acting as an agent of Allianz SE when performing that function, and the scienter of AllianzAM, including knowledge of the red flags in the internal audit, is therefore attributable to Allianz. Further supporting imputing AllianzAM's scienter to Allianz is the fact that the head of AllianzAM, Jacqueline Hunt, sat on the board of management of Allianz SE throughout the class period. Further supporting AllianzAM's, and therefore Allianz's scienter is the fact that shortly after Allianz's August 1, 2021announcement that it was reassessing risks related to the Structured Alpha scandal, Hunt stepped down from her position on September 30, 2021, before her contract with Allianz expired.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

185.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Allianz during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

186. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the OTC Pink market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

187. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

188. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

189. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements

– 83 –

made, in light of the circumstances under which they were made, not misleading;

(d)   whether the Individual Defendant caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)   whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)   whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

190.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

191.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's securities are traded in efficient markets;

(d)   the Company's securities were liquid and traded with more than one million shares trading daily on average during the Class Period;

– 84 –

(e)     the Company traded on the OTC Pink market and the Frankfurt Stock Exchange, was covered by more than 20 analysts, and has 35 market makers;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

192.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

193.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5

### Against all Defendants

194.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

– 85 –

195.   This Count is asserted against Allianz and AGI US and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

196.   During the Class Period, Defendants, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically, Defendant Allianz made the false or misleading statements at paragraphs 102, 104, 106, 114, 116, 118, 126, 128, 130, 160, 162, and 164 of the Complaint and Defendant AGI US made the false or misleading statements at paragraphs 108, 110, 112, 120, 122, 124, 132, 134, 136, 138, 140, 142, 144, 146, 148, 150, 152, 154, 156, and 158 of the Complaint.

197.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

198.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

199.   As a result of the foregoing, the market price of the Allianz's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the

statements described above and/or the integrity of the market price of Allianz's securities during the Class Period in purchasing Allianz's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

200.   Had Plaintiff and the other members of the Class been aware that the market price of the Allianz securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Allianz's securities at the artificially inflated prices that they did, or at all.

201.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

202.   By reason of the foregoing, Allianz and AGI US have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

203.   This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchases of common stock giving rise to the cause of action.

## COUNT II

### Violation of 10(b) of the Exchange Act and Rule 10b-5
### Against AGI US

204.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

205.   This Count is asserted against AGI US and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC.

– 87 –

206.   AGI US violated §10(b) of the 1934 Act and Rule 10b-5 in that it: employed devices, schemes and artifices to defraud. Specifically, AGI US altered and falsified numerous reports that it supplied to clients, failed to properly supervise the structured products group, and disregarded the three lines of defense model of risk management and oversight.

207.   AGI US acted with scienter in that it knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

208.   As a result of the foregoing, the market price of the Allianz's securities was artificially inflated during the Class Period. In ignorance of AGI US's fraudulent schemes, relied on the integrity of a market free from manipulation in Allianz securities during the Class Period in purchasing Allianz's securities at prices that were artificially inflated as a result of AGI US's fraudulent scheme.

209.   Had Plaintiff and the other members of the Class been aware that the market price of the Allianz securities had been artificially and falsely inflated by AGI US's fraudulent scheme, they would not have purchased Allianz's securities at the artificially inflated prices that they did, or at all.

210.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

211.   By reason of the foregoing, AGI US has violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and is liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

212.   This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchases of common stock giving rise to the cause of action.

## COUNT III

### Violation of Section 20(a) of The Exchange Act

### Against Allianz

1.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

2.   During the Class Period, Allianz participated in the operation and management of AGI US, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of its controlling position, it knew the adverse non-public information regarding AGI US's business practices.

3.   As the holder of 100% of ADS US shares, Allianz had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

4.   Because of its position of control and authority controlling shareholder, Allianz was able to, and did, control the contents of the various reports, press releases and public filings which AGI US disseminated in the marketplace during the Class Period. Throughout the Class Period, Allianz exercised his power and authority to cause AGI US to engage in the wrongful acts complained of herein. Allianz therefore, was a "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

5.      Allianz, therefore, acted as a controlling person AGI US. By reason of its controlling shareholding, Allianz had the power to direct the actions of, and exercised the same to cause, AGI US to engage in the unlawful acts and conduct complained of herein. Allianz exercised control over the general operations of AGI US and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

6.      By reason of the above conduct, Allianz is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

7.      This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchases of common stock giving rise to the cause of action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

– 90 –

Dated: October 6, 2023

Respectfully submitted,

/s/ *Jonathan Stern*
**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jonathan Stern
275 Madison Avenue, 40th Floor
New York, New York 10016
Tel: 212.686.1060
Fax: 212.202.3827
Email: jstern@rosenlegal.com
*Counsel for Plaintiff*

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS