**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID WEIR, individually and on behalf of all others similarly situated,<br>Plaintiff,<br><br>v.<br><br>ALLIANZ SE, et al.,<br>Defendants. | 2:23-cv-00719-DSF-MAA<br><br>Order Granting Motion to Dismiss (Dkt. 44) |

Defendants Allianz SE and Allianz Global Investors U.S. LLC ("AGI US") move to dismiss the Second Amended Complaint. Dkt. 44 (Mot.). Lead Plaintiff David Weir opposes. Dkt. 48 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15.

## I. Factual Background

Allianz is a multi-national corporation headquartered in Munich, Germany that provides insurance and asset management products. Dkt. 43 (SAC) ¶13. Its wholly owned indirect subsidiary AGI US is a Delaware limited liability company with its offices in New York. SAC ¶16.

The Structured Products Group was a team within AGI US that managed over $11 billion in seventeen different funds. SAC ¶18. These funds used an investment strategy called "Structured Alpha." Id.

Allianz uses what is called a "three lines of defense" internal control and risk management model across its subsidiaries, including AGI US. SAC ¶24. The first line of defense is "the management of day-to-day activities, of risks, and of risk controls." SAC ¶26. The second line is "the independent overseeing and challenging of the day-to-day risk-taking actions and controls performed by the first line." SAC ¶27. The second line of defense "includes compliance, legal, risk management, and actuarial functions." Id. The third line of defense is "the internal audit function." SAC ¶28.

"Each Structured Alpha Fund was supposed to track the performance of a specific benchmark, such as the S&P 500, while also outperforming the benchmark, using what is called an 'alpha' trading strategy." SAC ¶35. Part of the Funds' trading strategies were hedges that were supposed to offset losses in the event of a market crash. SAC ¶38. However, in good times, these hedges were a drag on profits. Id.

The Structured Alpha Fund managers emphasized to investors the risk management standards Allianz imposed on them, including the three lines of defense model. SAC ¶¶ 40, 41. However, three fund managers engaged in a fraud designed to mislead investors as to the actual level of risk being undertaken by the Structured Alpha Funds. SAC ¶44. The fund managers did not purchase the promised hedging positions, managed the funds to higher risk targets than represented, and fraudulently altered data supplied to investors regarding the magnitude of risk investors were exposed to. SAC ¶47.

The compliance and risk management personnel at AGI US, the second line of defense, failed to adequately oversee the fund managers, verify that the fund managers were adhering to the hedging strategies represented to investors, and detect the fraud. SAC ¶¶45, 93. The fund managers were able to alter risk reports before they were sent to investors. SAC ¶95. An internal audit uncovered red flags at AGI US, but an investigation was not escalated outside of the Structured Products Group. SAC ¶96.

At the beginning of the COVID pandemic in March 2020, five Structured Alpha Funds lost 49% and 97 % of their value and two funds were liquidated. SAC ¶99.

Between March 2018 and January 2020, Allianz ran a sponsored program of American Depository Reserves (ADRs) for American investors. SAC ¶8. The day after Allianz's August 1, 2021 disclosure of the Department of Justice's investigation into the Structured Alpha Funds, the price of the Allianz ADRs fell 8.75%.[1] SAC ¶¶167- 68. As more information regarding the fraud became public, Allianz's ADR price continued to fall. SAC ¶¶169–180.

In May 2022, AGI US pleaded guilty to securities fraud. SAC ¶100. AGI US was fined $2,331,189,703.78 and ordered to pay $3,238,748,199.69 in restitution. SAC ¶101. Allianz made the settlement payments to the Structured Alpha Fund investors and offered to pay a fine on behalf of AGI US. SAC ¶101.

## II. Legal Standard

### A. Personal Jurisdiction

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction." In re W. States Wholesale Nat. Gas Antitrust Litig., 715 F.3d 716, 741 (9th Cir. 2013). "When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995). "The plaintiff cannot simply rest on the bare allegations of its complaint, but uncontroverted allegations in the complaint must be taken as true." Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218, 1223 (9th Cir. 2011) (simplified). "[M]ere bare bones assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden." Swartz v. KPMG LLP, 476 F.3d

[1] Allianz's ADR program is described in greater detail below.

756, 766 (9th Cir. 2007). "Because there is no statutory method for resolving [personal jurisdiction], the mode of its determination is left to the trial court." Data Disc, Inc. v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977).

"Personal jurisdiction over a nonresident defendant is tested by a two-part analysis." Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398, 1404 (9th Cir. 1994). "First, the exercise of jurisdiction must satisfy the requirements of the applicable state long-arm statute." Id. "Second, the exercise of jurisdiction must comport with federal due process." Id. at 1404-05. The Due Process Clause permits the exercise of personal jurisdiction if the defendant has sufficient "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." LNS Enters. LLC v. Cont'l Motors, Inc., 22 F.4th 852, 858 (9th Cir. 2022) (quoting Walden v. Fiore, 571 U.S. 277, 283 (2014)). Because California's long-arm statute reaches as far as due process allows, see C.C.P. § 410.10, the Court need only consider whether the exercise of jurisdiction comports with due process. Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1205 (9th Cir. 2006) (en banc) (per curiam).

Personal jurisdiction may be either general or specific. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn. 8 & 9 (1984). A court may exercise general jurisdiction "only when a defendant is 'essentially at home' in the State." Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)). Specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." Ford Motor Co., 141 S. Ct. at 1024.

The Ninth Circuit applies a three-part test to determine whether specific jurisdiction can be established over a non-resident defendant: (1) The defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or

relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable. See Morrill v. Scott Financial Corporation, 873 F.3d 1136, 1142 (9th Cir. 2017).

**B. Failure to State a Claim**

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). Allegations contradicted by matters properly subject to judicial notice or by exhibit need not be accepted as true, Produce Pay, Inc. v. Izguerra Produce, Inc., 39 F.4th 1158, 1161 (9th Cir. 2022); and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (alteration in original) (quoting Twombly, 550 U.S. at 557). A complaint must "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . and factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). "Dismissal under Rule 12(b)(6) is proper when the complaint . . . fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

Allegations of fraud are excepted from the "notice pleading" standard of Rule 8(a)(2). Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 513 (2002). "[A] plaintiff must set forth *more* than the neutral facts necessary to identify the transaction." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) (superseded by statute on other grounds). Under Federal Rule of Civil Procedure 9(b), fraud claims must be pleaded with particularity, Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009), and must meet Iqbal's plausibility standard. Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011). A plaintiff must include "an account of the time, place, and specific content of the false representations" at issue. Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (simplified). Fraud allegations must "be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003).

Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action." Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc., 774 F.3d 598, 605 (9th Cir. 2014). The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1), "imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 877 (9th Cir. 2012). In order to properly allege falsity, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." Id. (simplified).

The court should freely give leave to amend when justice so requires. Fed. R. Civ. P. 15(a)(2)

## III. Discussion

### A. Personal Jurisdiction

Jurisdiction for claims brought under the Securities Exchange Act is governed by Section 27 of the Act. 15 U.S.C. § 78aa. "So long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." Sec. Inv'r Prot. Corp. v. Vigman, 764 F.2d 1309, 1316 (9th Cir. 1985). In a securities case, "minimum contacts may be established either by purposeful direction or purposeful availment." S.E.C. v. Ficeto, No. CV 11-1637-GHK RZX, 2013 WL 1196356, at *4 (C.D. Cal. Feb. 7, 2013).

Defendant's minimum contacts "must be the defendant's own choice and not 'random, isolated, or fortuitous.'" Ford, 141 S. Ct. at 1025 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)). "When (but only when) a company 'exercises the privilege of conducting activities within a state'—thus 'enjoying the benefits and protection of its laws'—the State may hold the company to account for related misconduct." Ford, 141 S. Ct. at 1025 (quoting Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement, 326 U.S. at 319 (1945)). This doctrine "provides defendants with 'fair warning'—knowledge that 'a particular activity may subject it to the jurisdiction of a foreign sovereign.'" Ford, 141 S. Ct. at 1025 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). For example, a company purposefully availing itself of a forum's market "has clear notice" of its exposure in that State to suits arising from local accidents involving its products. Ford, 141 S. Ct. at 1027 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Allianz argues that any connection to the United States established through its ADR program has been severed. The Supreme Court has stated that a corporation may "act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected

costs on to customers, or, if the risks are too great, severing its connection with [a forum]. . . ." Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty., 480 U.S. 102, 110 (1987). The case law describing how and when this severance might work is sparse, but district courts have suggested that one way for a corporation to sever connections with a forum is "to choose not to sell its services or products to residents [there][.]" Lexmark Int'l, Inc. v. Laserland, Inc., 304 F. Supp. 2d 913, 918 (E.D. Ky. 2004) (citing Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. at 1126–27) ("If Dot Com had not wanted to be amenable to jurisdiction in Pennsylvania, the solution would have been simple—it could have chosen not to sell its services to Pennsylvania residents.").

Allianz claims to have done precisely that. "ADRs 'allow U.S. investors to invest in non-U.S. companies and give non-U.S. companies easier access to U.S. capital markets.'" Stoyas v. Toshiba Corp., 896 F.3d 933, 940 (9th Cir. 2018) (citing Sec. & Exch. Comm'n, Office of Inv'r Education and Advocacy, "Investor Bulletin: American Depository Receipts" at 1 (August 2012)). "Specifically, ADRs are negotiable certificates issued by a United States depositary institution, typically banks, and they represent a beneficial interest in, but not legal title of, a specified number of shares of a non-United States company. The depositary institution itself maintains custody over the foreign company's shares." Stoyas, 896 F.3d at 940. "ADRs are registered with the Securities and Exchange Commission through the filing of Form F-6." Id.

Allianz filed its F-6 form in March 2018. SAC ¶8. The American depository institution was JP Morgan Chase Bank, N.A. Id. Allianz certified on its F-6 that it "published information in English required to maintain the exemption from registration under Rule 12g3-2(b) under the Securities Exchange Act of 1934[.]" SAC ¶7. However, less than two years later, on January 3, 2020, Allianz terminated its sponsored ADR program. SAC ¶8. JP Morgan then launched an unsponsored ADR program and transferred all of the outstanding sponsored ADRs into unsponsored ADRs. SAC ¶8. JP Morgan included a disclaimer in its announcement of its program that Allianz "shall have no liability

whatsoever in connection with the establishment and maintenance" of the unsponsored ADR program. Dkt. 44-7 (Ex. 5). Weir alleges that "Allianz continued to facilitate [the unsponsored program] . . . by publishing its annual and periodic financial statements on its website in English." SAC ¶8. Weir purchased unsponsored ADRs from JP Morgan on February 11, 2020. Dkt. 1-1 (PLSRA Certification).

Weir premises his complaint on both purposeful direction and purposeful availment theories of personal jurisdiction. SAC ¶¶7, 8. He alleges that Allianz purposefully directed its activities towards the United States by "making available English translations of its annual and periodic reports on its website" in keeping with SEC rules for its sponsored ADR program and by participating in virtual investor conferences for US Banks during the class period. SAC ¶7.

"By sponsoring an ADR . . . [a defendant takes] affirmative steps purposefully directed at the American investing public." Pinker v. Roche Holdings Ltd., 292 F.3d 361, 371 (3d Cir. 2002); see also S.E.C. v. Straub, 921 F. Supp. 2d 244, 255 (S.D.N.Y. 2013) (collecting cases). After soliciting funds from American capital markets, Allianz could have reasonably foreseen that, were there to be litigation concerning those solicitations, it would be haled into an American court. See Straub, 921 F. Supp. 2d at 256. This is perhaps why Allianz tried to sever its ties with American markets.

However, there is no authority for the proposition that severance retroactively ends the Court's jurisdiction over past conduct. Allianz argues that its statements directed at the United States in connection with its sponsored ADR program are "jurisdictionally irrelevant, because Allianz SE had severed its ties with the U.S. securities markets by the time Plaintiff bought Unsponsored ADRs, and 'the only claims to be assessed by the court' for 'determining whether there is personal jurisdiction' are 'those of the class representative.'" Mot. at 15. For this proposition Allianz cites Moser v. Benefytt, Inc., 8 F.4th 872, 877-78 (9th Cir. 2021), which holds that a defendant does not waive "a Rule 12(b)(2) personal jurisdiction defense to the claims of unnamed putative class members who [are] not yet parties to the case"

by failing to raise it in the defendant's initial response. 8 F.4th at 877. But this principle does not imply that a court loses jurisdiction over claims arising from allegedly fraudulent statements directed at the forum because the defendant later abandons that market. Allianz's reading of Moser is at odds with the rule that the proper jurisdictional question is "whether the *defendant's* conduct connects him to the forum in a meaningful way[,]" not whether the plaintiff's does. Walden, 571 U.S. at 290 (emphasis added).[2]

Allianz allegedly made misrepresentations in connection with a financial product that it sold in the United States. It may have severed ties with the market, but its product was still sold here. Having purchased this product, Weir may bring claims for the allegedly fraudulent statements Allianz made developing the market and allegedly inducing his purchase. Because the statements made after Allianz claims to have severed ties with the forum were still a part of a "course of conduct" at least initially directed at the United States, the Court has jurisdiction over a fraud claim arising from the statements before and after the end of the sponsored ADR program. See J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884 (2011) ("The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct.").

"Although reasonableness is considered as a separate factor in determining the existence of limited personal jurisdiction, a defendant need only prove the unreasonableness of a court's exercise of personal jurisdiction if it is shown that the defendant's activities were purposefully directed at the forum state." Doe v. Am. Nat'l Red Cross, 112 F.3d 1048, 1052 (9th Cir. 1997). Allianz has not contested the reasonableness of this Court's jurisdiction.

---

[2] The Court's opinion should not be construed as either commenting on or accepting Weir's adequacy as a class plaintiff.

Allianz's motion to dismiss for lack of personal jurisdiction is DENIED.

## B. Failure to State a Claim

Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j. Rule 10b-5, implementing Section 10(b), states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The elements of a claim under § 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission; (2) made with scienter (i.e., a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation . . . ; (5) economic loss; and (6) loss causation." Loos v. Immersion Corp., 762 F.3d 880, 886-87 (9th Cir. 2014), as amended (Sept. 11, 2014). Under the heightened pleading standard of the PSLRA, complaints must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement

or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Glazer Cap. Mgmt., LP v. Magistri, 549 F.3d 736, 741 (9th Cir. 2008). To establish falsity, a plaintiff "must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." In re Convergent Techs. Sec. Lit., 948 F.2d 507, 512 (9th Cir. 1991).

Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information[;]" "[d]isclosure is required under these provisions only when necessary 'to make . . . statements made, in light of the basic circumstances under which they were made, not misleading." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011) (citing 17 C.F.R. § 240.10b-5(b)). In order to be misleading, an incomplete statement "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002); see also Reese v. Malone, 747 F.3d 557, 570 (9th Cir. 2014) ("By omitting information regarding BP's detection of high corrosion levels, [defendant] affirmatively created an 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."), overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 619 (9th Cir. 2017)).

**1. Allianz Statements**

Weir identifies two categories of statements made by Allianz that he alleges are actionable under Rule 10b-5. Opp'n at 15–16. The first is descriptions of Allianz's Risk Organization and Management structure from its financial reports. They are largely identical and say:

OVERALL RISK ORGANIZATION AND ROLES IN RISK MANAGEMENT

> A comprehensive system of risk governance is achieved by setting standards related to organizational structure, risk strategy and appetite, limit systems, documentation, and reporting. These standards ensure the accurate and timely flow of risk-related information and a disciplined approach towards decision-making and execution at both the global and local level.
>
> As a general principle, the "first line of defense" rests with business managers in the related undertaking. They are responsible for both the risks and returns from their decisions. Our "second line of defense" is made up of independent global oversight functions including Risk, Actuarial, Compliance, and Legal, which support the Board in defining the risk frameworks within which the business can operate. Audit forms the "third line of defense", independently and regularly reviewing risk governance implementation, compliance with risk principles, performing quality reviews of risk processes, and testing adherence to business standards, including the internal control framework.

SAC ¶¶ 102, 114, 118, 126, 130, 160, 164.

Several iterations included the line: "Allianz SE has established dedicated responsibilities for the three lines of defense at its departments (including reinsurance)." SAC ¶¶ 106, 118, 130, 160, 164.

The second category is descriptions of Allianz's risk management framework contained in several financial reports:

> Allianz has developed a consistent operational risk management framework, which is applied across the Group and focuses on early recognition and proactive management of material operational risks. The framework defines roles and responsibilities as well as management processes and methods: Local risk managers, in their capacity as the "second line of defense", identify and evaluate relevant operational risks and control weaknesses via a dialog with the "first line of defense", report operational risk events in a central database, and ensure

> that the framework is implemented in their respective operating entity.
>
> This framework triggers specific mitigating control programs. For example, compliance risks are addressed via written policies and dedicated compliance programs monitored by the Group Compliance function at Allianz SE. The risk of financial misstatement is mitigated by a system of internal controls covering financial reporting.

SAC ¶¶ 104, 162.

The 2020 Group Report added that this framework was "based on proportionality[.]" SAC ¶162.[3]

Weir claims that these statements were misleading because both categories failed to disclose the conditions that made the fraud at AGI

---

[3] Another variation of this description read:

> Allianz SE has implemented the group-wide operational risk management framework that focuses on the early recognition and proactive management of material operational risks. The framework defines roles and responsibilities as well as management processes and methods. An important component of this framework is the Integrated Risk and Control System (IRCS), which ensures that effective controls or other risk mitigation activities are in place for all significant operational risks. Risk managers in the Allianz SE risk management function, in their capacity as the "second line of defense", identify and evaluate relevant operational risks and control weaknesses via a dialog with the "first line of defense", and in close interaction with both the other "second line of defense" functions at Allianz SE and with the audit function.
>
> In the IRCS approach, risk identification, assessment and controls vary between the different operational risk sources reporting, compliance and operations. For example, compliance risks are addressed via written policies. The risk of financial misstatement is mitigated by a system of internal controls covering financial reporting.

SAC ¶¶ 116, 128.

US possible. Specifically, Weir alleges that there were significant gaps and weaknesses in AGI US's controls as they related to the Structured Alpha Funds that should have been disclosed. SAC ¶¶ 103, 105, 107, 115, 117, 119, 127, 129, 131, 149, 161, 163, 165. He further alleges that the control functions at AGI US were not designed to ensure that the Structured Alpha Funds were being monitored in line with what investors had been told. Id. No one in the control function sought to verify that the Alpha Fund managers were adhering to the targets and strategies they represented to investors, and client communications were not reviewed by compliance personnel. Id. Because of AGI US's internal control failures, the fund managers were able to alter the risk reports sent to investors. Id. Weir also complains that Allianz's Internal Audit group failed to thwart the fund managers' scheme, making its description of "the third line of defense" misleading. Id.

"To be misleading, a statement must be 'capable of objective verification.' For example, 'puffing'—expressing an opinion rather than a knowingly false statement of fact—is not misleading." Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1275 (9th Cir. 2017) (quoting Oregon Pub. Emps. Ret. Fund, 774 F.3d at 606).

Weir does not adequately allege that any of Allianz's statements were objectively false. He states that Allianz did in fact deploy the "three lines of defense" model it described in financial statements. SAC ¶24. However, he claims that the "specific and detailed factual assertions" by Allianz are false "because there was a deficiency in the precise subject matter of the statements." Opp'n at 18. A description of risk management is not an "assurance of actual compliance[.]" In re Citigroup Sec. Litig., No. 20 CIV. 9132 (LAP), 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023) (finding that description of "three lines of defense" was not an actionable misrepresentation). Some of Allianz's purported misrepresentations explain that "[t]he risk of financial misstatement is *mitigated* by a system of internal controls covering financial reporting," SAC ¶¶ 104, 162 (emphasis added), not that the risk of financial misstatement is *eliminated* by the system of internal controls.

A statement that internal controls exist is not objectively false because the controls are later found ineffective. See In re Deutsche Bank Aktiengesellschaft Sec. Litig., No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017), aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft, 729 F. App'x 55 (2d Cir. 2018). Similarly, statements describing internal controls are not automatically rendered false by the subsequent discovery of corporate mismanagement that circumvented those controls. Id.

"'Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information' and instead require disclosure 'only when necessary to make statements made, in light of the circumstances under which they were made, not misleading.'" In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 699 (9th Cir. 2021) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)) (cleaned up).

Even if the descriptions of risk management and compliance systems did create a duty to disclose material information, Weir does not allege any material information that was in Allianz's hands at the time of the statements that investors were entitled to know. See Kang v. PayPal Holdings, Inc., 620 F. Supp. 3d 884, 897 (N.D. Cal. 2022) ("Of course, a party 'fails to disclose material information' to investors only when the party in question actually 'has the information that investors are entitled to know.'") (quoting Chiarella v. United States, 445 U.S. 222, 228 (1980)).

Weir has failed to allege a material misrepresentation or omission on the part of Allianz. The Court need not consider the other elements of his 10b-5 claim. In re First Am. Fin. Corp., No. CV 20-9781 DSF (EX), 2021 WL 4807648, at *11 (C.D. Cal. Sept. 22, 2021).

Allianz's motion to dismiss Weir's securities fraud claim against it for failure to state a claim is GRANTED.

### 2. AGI US Statements

AGI US moves to dismiss the securities fraud claim against it for failure to state a claim. Weir alleges a series of statements by AGI US concerning the Alpha Funds and AGI US's supervision of those funds, which are purported misrepresentations in light of the fund managers' fraud. SAC ¶¶108, 110, 112, 120, 122, 124, 132, 134, 136, 138, 140, 142, 144, 146, 148, 150, 152, 154, 156, 158.

Weir claims that reliance on these misrepresentations should be presumed because of the fraud-on-the-market doctrine. SAC ¶191. "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information *regarding the company and its business*[.]" Basic Inc. v. Levinson, 485 U.S. 224, 241, (1988) (quoting Peil v. Speiser, 806 F.2d 1154, 1160–61 (3d Cir. 1986) (emphasis added). But "the presumption of reliance is available only when a plaintiff alleges that a defendant made material representations or omissions *concerning a security* that is actively traded in an 'efficient market,' thereby establishing a 'fraud on the market.'" Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999) (citing Basic Inc., 485 U.S. at 247) (emphasis added).

AGI US's purported misrepresentations concern seventeen private equity funds, none of which Weir invested in. SAC ¶18. The statements concern securities that are neither actively traded on an efficient market, nor owned by Weir. Weir cannot point to misrepresentations concerning a security he did not invest in to show that the market incorporated that information into the price of the security he did buy. This would profoundly expand the class of statements actionable as securities fraud, but the Supreme Court has instructed lower courts that "[t]hough it remains the law, the § 10(b) private right should not be extended beyond its present boundaries." Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 165 (2008). This Court declines Weir's invitation to do so.

AGI US's motion to dismiss is GRANTED.

### 3. Control Person Liability

Allianz moves to dismiss Weir's control person claim against it. Weir's Section 20(a) claim against Allianz "fails because it cannot stand absent a primary violation." Kang, 620 F. Supp. 3d at 902 (citing Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002)). Allianz's motion to dismiss is GRANTED.

## IV. Conclusion

The Second Amended Complaint is dismissed. Weir is granted leave to amend his complaint in conformity with this Order if he can do so consistent with Rule 11 of the Federal Rules of Civil Procedure. An amended complaint may be filed and served no later than June 10, 2024. Failure to file an amended complaint by that date will waive Weir's right to do so and the case will be dismissed with prejudice. If Weir chooses to file an amended complaint, he should carefully consider the other issues raised by Defendants' motion and amend his claims where appropriate. Weir must provide a redlined version of the amended complaint to the Court's generic chambers email.

IT IS SO ORDERED.

Date: March 14, 2024

Dale S. Fischer

Dale S. Fischer
United States District Judge